### J. D. Buie v. Chicago, Rock Island & Pacific Railway Company et al.

No. 1029. Decided November 21, 1901.

**1.—Foreign Corporation—Business in State—Auxiliary Corporation.**

When one corporation makes use of another as its instrument through which to transact its business, the principal corporation is really represented by the agents of the subcorporation and its liability is the same as if it had done business in its own name. (P. 66.)

**2.—Same.**

See opinion for detail of facts attending the incorporation in Texas of the Chicago, Rock Island & Texas Railway Company and its contracts and relations with the Chicago, Rock Island & Pacific Railway Company, chartered by Illinois and Iowa, under which the former was held to be a mere creature or subcorporation of the latter company, and the latter the real owner and operator of the Texas lines. (Pp. 59-67.)

**3.—Same—Service of Process.**

The courts of Texas, under the facts appearing in this case, had personal jurisdiction over the Chicago, Rock Island & Pacific Railway Company on service on the officers and agents of the Texas corporation, in a suit in favor of a non-resident plaintiff, against the Iowa corporation, on a cause of action arising in

Iowa, for injury to a shipper on a cattle train, whose shipment was solely over the lines of the Iowa company. (Pp. 63-67.)

4.—Practice in Supreme Court.

The Supreme Court can not hold that the District Court was without jurisdiction, contrary to the ruling of the latter on a question of fact, unless the conclusion to be drawn from the evidence is so definite and certain that the trial court should have treated it as conclusively established. But see facts held to justify such conclusion. (Pp. 63, 64.)

5.—Construction—Illegality of Contract.

The technical rule of construction which presumes that an agreement was not intended to violate the Constitution and laws, will not be allowed to prevent an investigation by the courts into the real facts of corporate existence. (P. 64.)

Question certified from the Court of Civil Appeals for the Second District, in an appeal from Montague County.

*Galloway & Templeton, J. H. Harper,* and *W. S. Jameson,* for appellant.—The trial court erred in holding that the service of citation made on the defendant Chicago, Rock Island & Pacific Railway Company was insufficient to give the court jurisdiction over said defendant, and that the court had acquired no jurisdiction over it by such service. Rev. Stats., arts. 1222, 1223; Frick Co. v. Wright, 55 S. W. Rep., 608; Railway v. Gage, 63 Texas, 568; Railway v. Burke, 55 Texas, 329; Shane v. Railway, 28 S. W. Rep., 456; Tuchband v. Railway, 115 N. Y., 437; Norton v. Railway, 61 Fed. Rep., 618; Railway v. Novak, 61 Fed Rep., 573; 6 Thomp. Corp., secs. 8037, 8038.

Hovey was in fact the general manager and local agent in Texas of the Chicago, Rock Island & Pacific Railway Company, and the service of citation upon him was sufficient to give the court jurisdiction over said defendant, notwithstanding said Hovey may not have been formally designated as such general manager and local agent, and such service will require said defendant to appear and plead to the action. Same authorities.

The Chicago, Rock Island & Texas Railway Company was and is the agent in Texas of the defendant the Chicago, Rock Island & Pacific Railway Company, and service of citation upon said Texas company, by serving its vice-president, acting president and general manager, Hovey, gave to the court jurisdiction over said Chicago, Rock Island & Pacific Railway Company, and the court erred in refusing to assume such jurisdiction, and in refusing to render judgment against said defendant. Van Dresser v. Railway, 48 Fed. Rep., 202; Hester v. Fertilizer Co., 12 S. E. Rep., 563; Davis v. Railway, 28 S. W. Rep., 966; 6 Thomp. Corp., sec. 8034; In re Hohorst, U. S. (Law ed.), Book 37, p. 1211; Mech. on Agency, sec. 64; McWilliams v. Detroit Mills Co., 31 Mich., 275; Killingsworth v. Portland Trust Co., 18 Ore., 351; Tolbert v. Railway, 55 N. W. Rep., 1113 [sic].

Gilfillin, local agent at Bowie of the Chicago, Rock Island & Texas Railway Company, by virtue of his position as such local agent, was also local agent of the Chicago, Rock Island & Pacific Railway Com-

pany, and of the system composed of the said two defendants, and service of citation upon said Gilfillin as such local agent gave to the court jurisdiction over both of said defendants, and the trial court erred in refusing to so hold.

The service of the notice made on R. L. Heck, local agent at Terral, in the Indian Territory, was sufficient notice of the suit to require both of said companies to appear and answer thereto.

Under the evidence in this case, the issue of agency and the consequent sufficiency of the service of the citation on the defendant the Chicago, Rock Island & Pacific Railway Company, was a question of fact which should have been submitted to and determined by the jury, and the trial court erred in withdrawing the case from the jury and in refusing to submit to them such issue. Bradstreet Co. v. Gill, 72 Texas, 115; Prior v. Jolly, 40 S. W. Rep., 961; 6 Thomp., Corp., sec. 8033; 12 S. E. Rep., 562.

Where two or more railway companies enter into an agreement under which their respective lines of railways are merged into a single system and are operated as a single line, they become and may be treated as a single carrier; and in such cases such a system and each and all of the companies composing same are liable to third parties dealing with such carriers for all damages received by third parties upon any part of the consolidated lines of said parties and which are occasioned by the negligence of their agents, servants and employes. Railway v. Wells, 58 S. W. Rep., 842.

If the agents and servants of one or more corporations, in the course of their employment and while in the performance of an agreement of such corporations which is illegal or ultra vires, are guilty of negligence whereby a third party is injured and damaged, such corporations are liable for the consequences of such negligence, notwithstanding the illegality of the agreement; and in this case, the fact that the partnership between the two companies may have been prohibited by law will constitute no defense to plaintiff's action. Railway v. Howard, 178 U. S., 160; Railway v. Meyers, 62 Fed. Rep., 372; Bank v. Graham, 100 U. S., 699; Salt Lake City v. Hollister, U. S. (Law ed.), Book 30, 176.

This action being transitory in its nature, the defendant may be sued in any court of competent jurisdiction wherein legal service of process can be obtained on such defendant. Railway v. Mitten, 36 S. W. Rep., 282; So. Pac. Ry. Co. v. Graham, 34 S. W. Rep., 135; Railway v. Thompson, 33 S. W. Rep., 718; American Well Works v. De Aguayo, 53 S. W. Rep., 350; Barrow Steamship Co. v. Kane, 170 U. S., 100; Evey v. Railway, 81 Fed. Rep., 294; Telegraph Co. v. Clark, 38 S. W. Rep., 225.

Our statute provides that, "In any suit against a foreign private or public corporation, joint stock company or. association or acting corporation or association, citation or other process may be served on the president, vice-president, secretary or treasurer or general man-

ager, or upon any local agent within this State, of such corporation,
joint stock company or association or acting corporation or association.
Rev. Stats., art. 1233. In the amended petition it was charged that
the Texas company was and ever had been the agent in Texas of the
Pacific company, and that said last named company transacted its
business in Texas through and from the general offices of said defend-
ants at Fort Worth. That the officers and agents employed in said
offices were employed ostensibly by said Texas company, but that they
were in reality acting for and in behalf of said Pacific company and
for the system. That Hovey was vice-president of the Texas company
and that he was also general manager and local agent in Texas of the
Pacific company, and that Gilfillin was local agent at Bowie, in Mon-
tague County, for both of said companies. The first issue presented
by the certified questions is, was the Texas company, under the facts
certified, such an agent of the Pacific company as that service on it
gave the court jurisdiction to render a personal judgment against the
Pacific company? That one corporation can and often does act as an
agent of another, is, we take it, well settled. Van Dresser v. Railway
and Nav. Co., 48 Fed. Rep., 202; Killingsworth v. Portland Trust
Co., 17 Am. St. Rep., 737; Mechem on Agency, sec. 64; 6 Thomp. on
Corp., sec. 8034; McWilliams v. Detroit Mills Co., 31 Mich., 275:

If we are correct in the assumption that one corporation can act as
the agent of another, then we ask, how is such agent corporation to be
served? Manifestly this can be done only by serving its responsible
officers and agents. They, by virtue of their position with and relation
to such corporation, become themselves agents of the principal cor-
poration. Such agents, we insist, the proof shows Mr. Hovey and Mr.
Gilfillin to have been. Norton v. Railway, 61 Fed. Rep., 618; In re
Hohorst, 150 U. S., 653; Van Dresser v. Railway and Nav. Co., 48
Fed. Rep., 202.

But it is insisted that the agent upon whom process is served must
be either a general agent of the defendant, having general superin-
tendence over its business, or he must be an agent having control or
supervision over the transaction, or of some essential portion thereof,
out of which the injury complained of arose. And it is earnestly con-
tended by appellee, acting for itself and as amicus curiae in behalf
of its codefendant, that neither Mr. Hovey nor Mr. Gilfillin were
such agents. Is this contention sound? We insist that it is not (1),
because such are not the requirements of our statute, and (2) because
the purpose of the statute is only to provide for such service of process
as will make it reasonably certain that such process will be brought
to the notice of the said officers and agents of the defendant whose
duty it will be to act in the premises. We submit that the great weight
of the authority is to the effect that service of process on any foreign
corporation may be legally made on any local agent carrying on within
the domestic jurisdiction an essential portion of the business of such
foreign corporation, and it is not necessary that such agent should

have supervision over the transaction out of which the cause of action arose. Rev. Stats., art. 1223; Shane v. Railway, 28 S. W. Rep., 456; Tuchband v. Railway, 115 N. Y., 437; 6 Thomp. on Corp., secs. 8037, 8038; Societe Fonciere, etc., v. Milliken, 135 U. S. (Law ed.), Book 34, p. 208.

We insist that the sheriff's return on the citation served on Mr. Hovey establishes prima facie the fact that he was the vice-president and acting president and general manager and general superintendent of the Pacific company, and, in the absence of an answer by said defendant impeaching the return, it was and is sufficient to authorize and sustain a judgment by default against said company. If, however, it should be held, under the facts of this case, that the sheriff's return did not establish the facts therein recited, nevertheless it was alleged in the amended petition and proven by the evidence not only that Mr. Hovey was the general superintendent and general manager of said company in this state, but also that he was the "local agent within this State of such corporation," and that the Texas company of which he was the general superintendent and general manager was also a "local agent within this state" of the Pacific company. We therefore contend that the trial court had jurisdiction over said defendant and that it erred in refusing to exercise such jurisdiction. Frick Co. v. Wright, 55 S. W. Rep., 608; Railway v. Burke, 55 Texas, 327.

Addressing ourselves to the second question certified herein, we submit that one corporation can be, and that it often is, a mere creature and subcorporation of another corporation, and that such subcorporation is often organized and controlled and dominated by the parent corporation, so to speak, as a convenient method of exploiting the business of said parent corporation in another state, and in such a case the subordinate corporation, where it fulfills the purpose of its organization, becomes the agent of the original or parent corporation. 6 Thomp. on Corp., sec. 8034; Railway v. Bank, 108 Fed. Rep., 482.

That such was the relationship between the Pacific company and the Texas company the evidence in this case, as we view it, abundantly shows. The written agreement between the two companies gives the Pacific company practical control over the affairs of the Texas company for a period of 999 years, and this latter company, by the terms of said agreement, is authorized to secure and route over the lines of both of said defendants all through freight that it can get, destined for eastern points. Not only this, but it is authorized to fix the through freight charges on all through freight, and to make same binding on the Pacific company. Moreover, it is bound to receive and transport over its said line of railway at the through rate fixed by the Pacific company all west-bound traffic which this last named company can secure and route over both lines. Acting under this agreement the two companies have been engaged in operating the two lines of railway practically as one line, so much so that the end of the

first freight division of the two roads north of Fort Worth is at Chickasha, Indian Territory, on the line of the Chicago, Rock Island & Pacific Railway, while the end of the first passenger division north of Fort Worth is at Caldwell, Kan. Over these divisions all trains, both freight and passenger, were moved under the orders of M. E. Sebree, who was acting as trainmaster for both companies under the general supervision of Mr. Hovey. So that it appears that the very train that carried appellant's cattle to market, and upon which he was a passenger at the time he was injured, was made up and moved out of Ryan, Indian Territory, by employes of the two companies acting under the orders of Mr. Sebree, over whom Mr. Hovey exercised general supervision. If these facts do not constitute the Texas company and its general superintendent and general manager agents of the Pacific company, we are at a loss to understand what more would be necessary to constitute them such agents.

In meeting this contention, the attorneys of the Texas company in behalf of their client, and incidentally acting as amici curiae in behalf of the Pacific company, insist that these two companies can not sustain to each other the relation suggested, since so to do would constitute a violation of our law. To this contention we reply, that having associated themselves together in such a manner, their relationship of principal and agent is an accomplished fact and they can not evade the consequences of their acts by pleading the illegality of their actions. The State might complain, but surely they can not do so. Railway v. Howard, 178 U. S., 160; Railway v. Meyers, 62 Fed. Rep., 372; Railway v. Peninsular Land and Trans. Co. (Fla.), 17 Law. Rep. Ann., 45; Bank v. Graham, 100 U. S., 699; Salt Lake City v. Hollister, U. S. (Law ed.), Book 30, p. 176; Railway v. Bank, 108 Fed. Rep., 482.

*N. H. Lassiter* and *Theodore Mack,* for appellee.—The questions propounded are so comprehensive in their scope as to impel a full review of the trend of judicial decisions bearing upon the subject, as well as a consideration of our statutes on the subject.

It will be seen that a right is granted, by Revised Statutes, article 1194, section 25, to sue a foreign corporation, not incorporated by the laws of this State, and doing business in this State, while article 1223 merely provides how citation shall be served. And as construed by the court in Railway v. Whitley, 77 Texas, 130, the words "may be sued" should be understood "may not be sued."

At common law, in the absence of an express statutory provision, a foreign corporation can only be sued by means of an attachment of its property. Anderson v. Railway, 99 Mass., 534; Robb v. Railway, 47 Mo., 540; Middough v. Railway, 51 Mo., 520.

In Pennoyer v. Neff, 95 United States, 714, the Supreme Court of the United States announced the doctrine that personal service of citation on a defendant within the territorial limits of the State or his volun-

tary appearance was, save and except in suits to determine the status of a citizen toward a nonresident, essential to the jurisdiction of a court to render a personal judgment against a nonresident. The well established and rigidly adhered to rule so lucidly enunciated in that case was, by the same jurist who wrote the opinion therein, held to apply to foreign corporations, with only this difference in procedure, viz., a corporation being an artificial being, capable of acting only through agents, and reachable only through them, process must of necessity be served upon them. St. Clair v. Cox, 106 U. S., 350.

Applying the principles of that leading case to the facts disclosed by the record of the case at bar, we find, by process of differentiation, the facts of this case are infinitely stronger in favor of the action of the trial court.

Section 9 of article 4 of the traffic agreement required the Pacific company to furnish equipment to the Texas company, for the use of which, customary compensation was provided. Section 12 provided that both parties shall furnish power to move through traffic over their respective tracks. In so far as this agreement is concerned, it is susceptible only of one construction, to wit: That its purpose was to govern and facilitate the handling of through traffic only. And this seems to be and is a perfectly lawful agreement in view of the legislation upon the subject, as disclosed by article 4535 of our Revised Statutes, which requires all railways to receive from all other railway companies with which they may connect at the State line, all freight and passengers coming to it from such connecting line.

In the absence of a voluntary appearance by the Pacific company, three conditions must concur or coexist in order to give our courts jurisdiction in personam over it, viz.: (1) It must appear as a matter of fact that it was carrying on its business in Texas; (2) that such business was transacted or managed by some agent or officer appointed by and representing the foreign corporation; and (3) the existence of some local law making such foreign corporation amenable to suit in Texas as a condition, express or implied, of its doing business, if such be the case, in this State.

It is self-evident, in the absence of the statute providing for service of citation in suits against foreign corporations, that a plaintiff is remitted to the common law for relief. Under the common law service of process must be had on the president of the corporation. Palace Car Co. v. Harrison, 25 So. Rep., 698. Our statute, however, provides for service upon the agent of a foreign corporation doing business in Texas. We have no statute requiring foreign corporations, other than insurance companies, to designate officers or agents on whom service of process shall be made as a condition precedent to transacting business in Texas. Our statute, article 1194, can not possibly have any extraterritorial effect, so as to bring within its purview, and bind or give jurisdiction over, a foreign corporation, in personam, which is not carrying on business within our State, even though it might have as its agent for

through traffic only a corporation domiciled in this State. United
States v. Telephone Co., 29 Fed. Rep., 36.

The convertible term "doing business" or "carrying on business" has.
been construed by a court of very high repute. In Beard v. Publishing
Company, 71 Alabama, 60, Stone, Judge, held: "There must be a
doing of some of the works or an exercise of some of the functions for·
which the corporation was created, to bring the case within that clause."·
See also Sullivan v. Timber Co., 15 So. Rep., 941.

In Shields v. Railway, 30 Law Journal.(Queen's Bench), 331, it was.
held, "that a railroad company does not carry on business in a certain.
place, within the meaning of a statute defining the locality of jurisdic-·
tion over it, merely because it has a station there by which passengers.
and freight are received and contracts therefor made." Fairbank Co.
v. Railway, 54 Fed. Rep., 421; Construction Co. v. Fitzgerald, 137
U. S., 98; Dallas v. Railway, 2 McArth., 146; Rolling Mill Co. v.
Iron Co., 32 N. J. Law, 15; United States v. American Bell Tel. Co.,.
29 Fed. Rep., 37.

Confined as we are to the facts stated in the certificate of the Court of
Civil Appeals (63 Southwestern Reporter, 627), we deduce therefrom
the following conclusions of fact, viz: That neither Hovey nor Gil-·
fillan were officers or agents of the Pacific company; that the notice·
served upon Heck, in the Indian Territory, was ineffectual to subserve.
the purposes of its issuance; that the traffic agreement recited in the·
certified question was being carried out in the through transportation of·
freight and passengers; that Mr. Lowe, who resides at Topeka, Kan.,.
one of the general attorneys of the Pacific road, owned nearly all the·
stock of the Texas company and dictated its policy. As to the ownership¡
of the bonds of the local company, that matter is wholly immaterial.
under any contingency. No issue of fraud is tendered, and it must be·
concluded that the organization of the Texas company was legitimate in
its purposes, nor is the Texas company alleged to have been negligent in
the performance of any duty it owed to appellant. So that the question.
narrows itself down, after all, to the legal effect of the traffic agreement.
between the two companies, which related only to through business and.
in no manner concerned the shipment of live stock, during the trans-·
portation of which appellant was injured, in the State of Iowa.

In one sense of the term this case is one in which an attempt is being·
made by a nonresident of the State to drag in a nonresident corporation,
by some mysterious alchemy of the law, to answer an action sounding·
in tort committed in a sister State, and thus to make the Texas courts the:
"dumping grounds" of litigation in which its citizens or persons subject:
to its jurisdiction have no earthly interest. Surely the courts of the:
Indian Territory, Iowa and Illinois are open to appellant for the asser-·
tion of his demand for damages, and our Texas courts, already overbur-·
dened, should not be weighted down with the responsibility of adjudi-·
cating matters which did not originate in this State and between non-·
residents. It is a fact generally known in Texas that for years past the:

practice has prevailed of indiscriminately "dumping in" personal injury
suits in the courts of those counties where juries were reputed to be
liberal in the award of damages. So prevalent became this concentra-
tion of damage suits that the Legislature, at its regular session in 1901,
was constrained to enact a law materially changing the law fixing the
venue of suits against railways. See Acts 27th Leg., 1901, p. 31.

BROWN, ASSOCIATE JUSTICE.—The Court of Civil Appeals for the
Second Supreme Judicial District has submitted to this court the fol-
lowing statement and questions:

"We deem it advisable to present to your honors for adjudication,
as provided in article 1043 of the Revised Statutes, the issue of law
raised by appellant's first assignment of error, whether or not, upon the
statement following, the District Court of Montague County had juris-
diction to render a personal judgment against the Chicago, Rock Island
& Pacific Railway Company.

"This suit was brought in the District Court of Montague County by
appellant, a nonresident, against the Chicago, Rock Island & Pacific
Railway Company, also a non-resident, being a corporation chartered
under the laws of Iowa and Illinois, and against the Chicago, Rock Island
& Texas Railway Company, a corporation chartered under the laws of
Texas, to recover damages resulting to appellant from personal injuries
received by him in the State of Iowa on the railway and through the
negligence of the Chicago, Rock Island & Pacific Railway Company,
while traveling on a drover's pass accompanying a shipment of live stock
from Ryan, Indian Territory, to Chicago, Illinois.

"The Chicago, Rock Island & Pacific Railway Company, hereinafter
styled the Pacific company, made no appearance in the case, and judg-
ment by default was taken against it upon citations served upon S. B.
Hovey as vice-president and acting president, general superintendent
and general manager of both of said companies, and upon J. D. Gilfillin,
as local agent thereof at Bowie, in Montague County, Texas; but affi-
davits were filed by Hovey and Gilfillin (who were agents and officers
of the Texas company), denying that they were officers or agents of the
Pacific company, who also testified to the same facts, and upon final
hearing the court dismissed the suit as to the Pacific company for want
of jurisdiction and instructed a verdict in favor of the other company,
from which judgment this appeal is prosecuted.

"A notice, as provided in the statute for serving notice on a nonresi-
dent defendant, was also served on one R. L. Heck, as local agent at
Terral, Indian Territory, who was local agent there of the Pacific com-
pany, but who testified that the Texas company had no agent there,
although he transacted some of its business.

"The evidence showed that the railway of the Pacific company was
built through Indian Territory to the middle of Red River in the sum-
mer or fall of 1892, and that this line of railway was thence extended
and completed to Fort Worth in the early part of the succeeding year

by and in the name of the Texas company, which had been chartered for that purpose, and thus became a part of what has since been known as the "Rock Island Route," the two companies entering into an agreement (in January, 1893) for the operation of said line or lines of railway, which is quoted in full in the printed brief of the Texas company, pages 4 to 14. The substance of the scope and purpose of this agreement is sufficiently given, we think, for the purposes of this certificate in the printed brief of appellant, from which we quote as follows:

" 'The purpose of said agreement is set out in section 2, article 1, thereof as follows: It is declared to be the purpose of the parties hereto, by the execution of these articles and the performance of the several covenants, agreements, and premises herein set out to establish and operate through lines of railway to connect, when same can be done with reasonable directness, all points on the lines of both of the parties hereto, treating all railroads with which either party may have traffic or running arrangements or of which it shall have any leasehold interest as a part of the line of the party hereto with which it is so related, and to secure the operation of all said lines as to through traffic as they should be operated if all were owned by one corporation.

" 'By section 1, article 2 of said agreement the Pacific company bound itself to purchase at par value the bonds of the Texas company, not exceeding $20,000 per mile; and by section 2 of said article it bound itself to deliver to the Texas company all west-bound through traffic which it should receive for transportation to any point which could be reached with reasonable directness by through lines composed in whole or in part of some portions of the railways of the parties to said agreement; and it also bound itself to make all reasonable efforts to secure the transportation of all through traffic which might be received by it, over such through lines. By section 4 of said article, said Pacific company bound itself to receive and transport over its said lines all through traffic delivered to it by the Texas company.

" 'By section 1, article 2 of said agreement, the Texas company bound itself, in so far as it lawfully could, to deliver to the Pacific company all east-bound through traffic received by it for transportation to any point which could be reached with reasonable directness by a through line composed in whole or in part of the railways of said companies, and that it would make all lawful and reasonable efforts to secure the transportation of all such through traffic which might be received by it, over such through lines.

" 'By section 2 of said article, said Texas company bound itself to receive from said Pacific company and transport over its line all west-bound traffic.

" 'By section 6 of article 4, said agreement provided that the rate on all west-bound through traffic which should pass over any through line established by said agreement should be fixed from time time by the Texas company, and rates on west-bound through traffic should be fixed by the Pacific company.

" 'And by section 7 of article 4 of said agreement, it is provided that all such through rates shall be prorated between the companies upon the basis of the mileage over which such traffic shall be transported, counting every mile of the road of the Texas company as one and one-half miles, and every mile of the road of the Pacific company as one mile.

" 'Section 8 of this article provides that each company shall keep full and accurate account of all through traffic passing over said line, and a statement of such account shall be delivered monthly each to the other; and it is further provided in said section that each company shall have the right by its attorney or agent to examine, at any time during business hours on business days, each other's books, accounts, and papers relating to through business, and shall have the right to make transcripts of such books, accounts, and papers. It was also provided in the latter part of this section that the Texas company should keep a full, true and correct account of its receipts from all sources and its disbursements for all purposes, and exhibit same on demand to the Pacific company or its duly authorized agent.

" 'By section 9 of said article, said Pacific company bound itself to furnish to the Texas company on request all such equipments as should be necessary for the operation of the railway of the said Texas company, for the use of which it should receive the same compensation as usually allowed for such equipment.

" 'By section 12 it is provided that the parties to said agreement shall join in operating through trains for the transportation of through traffic, and that each of said parties would furnish power to move same over their respective tracks.

" 'Section 16 of said article was as follows, to wit: "This contract shall be obligatory on the parties for a term of nine hundred and ninety-nine years from the first day of January, 1893, and the Rock Island company (Pacific company) is expressly authorized to assign and transfer its interest in same by mortgage or other conveyance of its railway and other railway property." '

"The further undisputed facts relied upon by appellant, and set out in his printed brief from pages 12 to 22, to show the relation between those two companies, indicate that they were carying out the agreement thus entered into in the practical operation of the 'Rock Island Route' or system in the through transportation of passengers and freight. It was further made to appear that the president of the Texas company, M. A. Lowe, who resides at Topeka, Kan., was one of the general attorneys of the Pacific company, and that he owned nearly all the stock of the Texas company, and dictated its policy, and that no dividends had ever been paid on the Texas company's stock, and that the Texas company had reported to the Interstate Commerce Commission that it was controlled by the Pacific company, which owned the majority of its capital stock and bonds. It further reported for the year ending June 30, 1899, that its bonds were owned by the Pacific company, which controlled it by a traffic agreement.

"For a statement more in detail of the undisputed facts bearing upon the matter in question, we respectfully refer, as a sort of exhibit to this statement, to the printed briefs which the rules require to accompany this certificate; and if in any respect we have misconstrued what is thus referred to, we do not want to be understood as intending to change or modify, but only to condense what is there set out in full.

"In conclusion, if the question above referred to your honors should seem too general, then, and in that event only, we subdivide it and certify as follows:

"1. As the facts undoubtedly tended to prove that the Texas company was the agent of the Pacific company for all through business between points in Texas and Chicago, Ill., whether or not the trial court by virtue of this fact alone, and the service of citation upon the proper officers and agents of the Texas company, or notice on the agent of the Pacific company as above shown, acquired jurisdiction to render a personal judgment against the Pacific company in favor of a nonresident plaintiff upon a cause of action arising in the State of Iowa, independent of and not at all connected with any through business or transportation between the two companies, and due alone to the negligence of the foreign corporation?

"2. Whether or not from the manner and circumstances under which the Texas corporation was chartered, and from the manner in which the two companies transacted business, it should be held that the Texas company was a mere creature or subcorporation of the Chicago, Rock Island & Pacific Railway Company, and that by service on the officers and agents of the Texas company as a part of the 'Rock Island system,' the court acquired jurisdiction of the Pacific company also?"

From the briefs referred to by the court, we state the following material facts not embraced in the statement of the court, as a part of the statement upon which our opinion is based: The railroad of the Pacific company was constructed through the Indian territory to a point near to and north of Red River in the summer and fall of 1892, at which point a short halt was made, when, for the purpose of continuing the road into Texas to Fort Worth, the Texas company was organized and the construction was resumed from the point north of the river and continued without interruption until the road reached the city of Fort Worth. In organizing the Texas company, its capital stock was divided into 1505 shares, of which 1499 were placed in the name of M. A. Lowe, then and for some time previously one of the general attorneys of the Pacific company, and one share each in the names of C. H. Thompson, of Oklahoma; J. T. Harris, of Ringgold, Texas; Z. T. Lowry and J. H. Matthews, of Bowie, Texas, and F. E. Dietrich and S. B. Hovey, of Fort Worth, Texas, the last two being then and for many years prior thereto in the employ of the Pacific Railroad Company. M. A. Lowe was made president of the company; S. B. Hovey, vice-president and superintendent; F. E. Dietrich was made the secretary and treasurer of the

Texas company, and M. V. Harris, its auditor,—the latter then and for many years an employe of the Pacific company.

In addition to the facts concerning the contract entered into between the two companies, the undisputed evidence shows that the contract provided that its terms should extend to all railroads which might thereafter be owned, leased, or otherwise under the control of either one of the contracting companies, and that the Pacific company should have the right "to assign and transfer its interest in the contract by mortgage or other conveyance of its railway and other railway property." It is the declared purpose of the contract to secure the operation of "all said lines as to through traffic as they should be operated if all were owned by one corporation."

The Texas company has never owned and does not now own any rolling stock of its own, and has not, with perhaps a few exceptions, operated any train over that part of the road lying between Fort Worth and Red River which did not pass beyond the river and extend beyond the limits of the State. Through passenger trains have been operated from Fort Worth to Chicago ever since the road was constructed to Fort Worth. The freight trains have been operated from Fort Worth to Chickasha in the Indian Territory, and at no time has there been any change of crews at the line of the State or any other intermediate point. The freight division which embraces the Texas road extends from Fort Worth to Chickasha in the Indian Territory, and is under the control of a superintendent who has his office at Fort Worth and controls the line between the two points.. The first passenger division, including Fort Worth, extends to Caldwell, Kan., and no freight or passenger division has ever existed at any point between Fort Worth and Chickasha.

All of the rolling stock used upon the Texas road has been furnished by the Pacific company, and all employes engaged in operating the trains have been employed by and working for both companies, but such employes wear the badge of the Pacific company. The expenses of operation have been borne by the respective companies upon a mileage basis and the earnings divided upon the same basis. The train crews are employed and discharged indiscriminately by the officers of the respective companies; that is, when in Texas they are controlled by the officers known as representing the Texas company, and when out of Texas they are controlled by the same officers for the Pacific company. The folders which are circulated advertise the Texas road with the other as the "Great Rock Island Route."

The question submitted involves the determination of the fact, was the Texas corporation organized in good faith by its stockholders as an independent corporate body, or was it organized by the Pacific company to be used as an instrument by which the foreign corporation might carry on its business in this State? If the trial court had found that the Texas corporation was the creature of the foreign corporation and had sustained the service of citation and entered judgment against the Pacific company, that judgment could not have been set aside by this court for want

of evidence to support its jurisdiction of the person of the foreign cor-
poration. But the trial court having found to the contrary and having
refused to enter judgment against the foreign corporation, this court
can not hold that the District Court had jurisdiction upon the facts
stated unless the conclusion to be drawn from the evidence is so definite
and certain that the trial court should have treated it as conclusively es-
tablished. Counsel for the appellee suggest that a transaction by which a
foreign corporation would secure control of a domestic corporation in
Texas, as here claimed, would be contrary to the Constitution and laws
of this State, and that this court should presume that the agreement and
contract between the parties was not intended to be a violation of the
Constitution and laws of Texas. In answer to a similar proposition, the
Court of Appeals of the State of New York said: "We have of late re-
fused to be always and utterly trammeled by the logic derived from cor-
porate existence where it only serves to distort or hide the truth." This
court has always refused to be controlled by technicalities when inter-
posed to prevent an investigation into the real facts of a case. Courts
will look beneath the mask of legal forms for the real facts of any trans-
action presented to them for investigation. The lawfulness of this trans-
action is not now before the court, for if the Pacific company was in fact
doing business in Texas by its agents, it was amenable to our laws and
subject to the jurisdiction of the courts, whether its presence was lawful
or not.

When the track of the Pacific company was completed to a point near
Red River, a necessity arose for the organization of a corporation in
Texas by which that track could be extended to Fort Worth, and it is
said in the statement that the Texas corporation was organized for the
purpose of building that railroad track into Texas. It is improbable that
three citizens of Texas and one of Oklahoma, in whose names one share
each of the stock was placed, originated the scheme of constructing the
road and organizing this corporation, for they neither had the interest
to be served nor the ability to accomplish the purpose, but the Pacific
company had large interests involved and possessed the means. It would
be willful blindness if we failed to see, through the masks of legal forms,
that the stock placed in the names of the employes of the Pacific com-
pany was really owned by that company and that in fact it was the pro-
moter of the Texas corporation. The organization of the subcorporation
supports this view. The limited number of the stockholders and placing
the stock in the names of persons under the control of the Pacific com-
pany, followed by the selection of the attorney and employes of the for-
eign company to the four principal offices of the new corporation,
strongly indicate that in controlling the business, the Pacific company
provided the mastery for itself. The road could not have been built upon
the stock, and the Pacific company took all of the bonds of the new com-
pany at the rate of $20,000 per mile, sufficient to pay for the construc-
tion of the road in Texas. Holding the stock and the bonds, the foreign
company was in fact possessed of all the power that resided in the cor-

poration, and exercised it through officers selected from among those known to be in its interest. The so-called agreement between the two corporations showed the power of the one over the other, for no independent corporation would have bound itself to work for another for so great a period of time, giving up all chance of benefits to arise from the construction of new roads affording new connections and increased business. That provision of the agreement which secures to the Pacific company the power to assign the contract by mortgage or sale of its property is an unmistakable stamp of subjection.

The subsequent operation and management of the railroad is consistent only with the idea that the corporations are one and indivisible in their every interest. The men who constitute the crews on the freight and passenger trains leaving Fort Worth go northward nominally in the employ of the Texas corporation until the imaginary State line has been passed, when, by some kind of mysterious change, they become employes of the foreign company. Returning, they undergo a similar change in reverse order. South of Red River they may be employed or discharged by an officer in the name of the Texas corporation; when north of Red River, the same men are subject to the same officer in the name of the Pacific company. The intent "to secure the operation of all said lines as to through traffic as they should be operated if all were owned by one corporation" was signally accomplished. If we view these corporations from any standpoint, it will be difficult to distinguish their corporate powers, management or officers so as to ascribe any function of corporate control to the Texas company, and we conclude that the Texas company is but the instrument used by the Rock Island and Pacific company to carry on its business in Texas.

By organizing the Chicago, Rock Island & Texas Railway Company and through it operating the railroad in Texas, the Chicago, Rock Island & Pacific Railway Company was doing its business in Texas by and through those persons who purported to represent the subcorporation, and the principal corporation was legally in Texas through its said agents and was liable to suits in the courts of this State by service of process upon the agents which represented it in that business. St. Claire v. Cox, 106 U. S., 355; Hatcher v. United Leasing Co., 75 Fed. Rep., 368; Lehigh Mining and Mfg. Co. v. Kelly, 160 U. S., 327; Railway v. Bank, 108 Fed. Rep., 482; Norton v. Railway, 61 Fed. Rep., 618; Interstate Tel. Co. v. Baltimore & Ohio Tel. Co., 51 Fed. Rep., 49; Montgomery v Forbes, 148 Mass., 252; Day v. Postal Telegraph Co., 66 Md., 365.

In the case of St. Claire v. Cox, above cited, Mr. Justice Field, of the Supreme Court of the United States, made an elaborate and able review of the liability of corporations to suit and service in other States than those in which they are created. The gist of the decision is expressed in the following language: "Whilst the theoretical and legal view that the domicile of a corporation is only in the State where it is created was admitted, it was perceived that when a foreign corporation sent its offi-

cers and agents into other States and opened offices and carried on its business there, it was, in effect, as much represented by them there as in the State of its creation. As it was protected by the laws of those States, allowed to carry on its business within their borders and to sue in their courts, it seemed only right that it should be held responsible in those courts for obligations and liabilities there incurred." This is a clear statement of the principle that by sending its agents into another State, a foreign corporation becomes amenable to its laws and subject to the jurisdiction of its courts.

In Hatcher v. The United Leasing Company, the question was as to the liability of one corporation which had leased its property to another. The attempt had been made, by organizing another corporation, to carry on the business under the form of a lease; but the circumstances showed that the lessor in fact dominated and controlled the property in the hands of the lessee, and Judge Hallett, of the United States Circuit Court, said: "In ought not to be said that by a change of organization and name the people animating both companies can relieve themselves from any just liability to their creditors. The matter of putting off corporate life under the forms of law has grown into grotesque proportions. A change of name in a natural person is regarded with suspicion, but a corporation may do it without reproach." It was held that notwithstanding the form in which the contract had been drawn up was regular and sufficient upon its face, the substantial truth was that there had been no change in the control of the property and therefore no change in liability.

The matter in contest in Montgomery v. Forbes, before cited, was the liability of one who organized a corporation under the forms of law, taking the stock himself, and conducted business in the name of the corporation, claiming that he was not personally liable; but the court held there was in fact no corporation organized. The court said: "He can not escape responsibility for his purchases by the device of putting such a mere name between himself and the plaintiffs. The purchase was in substance by and for himself alone."

A question quite similar to this was presented in Lehigh Mining and Manufacturing Company v. Kelly, above cited. A Virginia corporation desired to file a suit in the United States Circuit Court in that State, and the stockholders formed a corporation in Pennsylvania, in the form and manner required by law, for the purpose of prosecuting the suit, but the Supreme Court held that it was in reality the same corporation and jurisdiction was denied.

The authorities cited fully sustain the proposition that when one corporation makes use of another as its instrument through which to perform its business, the principal corporation is really represented by the agents of the subcorporation, and its liability is just the same as if the principal corporation had done the business in its own name.

No one of the facts or circumstances in evidence would, alone, be sufficient to show the Chicago, Rock Island & Pacific Railway Company

subject to the jurisdiction of the courts of this State, but the combined force of all of these facts and circumstances compel the mind to the conclusion that the chartering of the Chicago, Rock Island & Texas Railway Company was a mere mask under which the Pacific company carried on its business in Texas.

We answer that upon the service stated and under the facts related in the statement, the District court of Montague county had jurisdiction to enter a personal judgment in this case against the Chicago, Rock Island & Pacific Railway Company.