**BELL OIL & GAS COMPANY, Appellant,**

v.

**ALLIED CHEMICAL CORPORATION,**
Appellee.

No. 15115.

Court of Civil Appeals of Texas.

Houston (1st Dist.).

Nov. 2, 1967.

Rehearing Denied Nov. 30, 1967.

Bass C. Wallace, Houston, Andrews, Kurth, Campbell & Jones, Houston, of counsel, for appellant.

B. Jeff Crane, Jr., Theodore Crowell, Houston, Vinson, Elkins, Weems & Searls, Houston, of counsel, for appellee.

COLEMAN, Justice.

This is a suit for debt. The principal question involved is the liability of appellant for debts incurred by an affiliated corporation and a subsidiary corporation.

Allied Chemical Corporation sued Mid-Tex Development Company, Apollo Oil Company, Lubell & Company, a partnership, and Bell Oil & Gas Company, to recover damages measured by the total of certain unpaid invoices on open account sales of gasoline and other petroleum products to Mid-Tex and Apollo. Prior to trial Lubell & Company was voluntarily dismissed.

Upon trial to the court without a jury, judgment was rendered and entered for Allied Chemical against Mid-Tex in the sum of $62,877.13, plus interest, and against Apollo in the sum of $33,251.38, plus interest. Judgment was also rendered and entered, jointly and severally, against Bell Oil in the sum of those amounts. Only Bell Oil has appealed.

By appropriate points of error appellant contends that neither the pleadings nor the proof support the judgment entered; that there is no evidence that appellant acted as the alter ego of Mid-Tex or Apollo; and that such findings are contrary to the great weight and preponderance of the evidence.

The trial court filed findings of fact and conclusions of law, in addition to certain findings of fact and conclusions of law set out in the judgment. The findings contained in the judgment read:

"At the time material hereto Bell Oil & Gas Company was interested in the continued operation of Mid-Tex Development Company and Apollo Oil Company because of the interlocking ownership, because of the debt owed to Bell Oil & Gas Company by Mid-Tex Development, Inc., and because of its lease with Oriole Oil Company and its subleases to Mid-Tex Development Company; that Bell Oil & Gas Company was interested for those reasons in having gasoline and oil supplied to Mid-Tex Development Company and Apollo Oil Company and the extension of credit to Mid-Tex Development Company and Apollo Oil Company by Allied Chemical Company and its Union of Texas Petroleum Division; that Bell Oil & Gas Company paid 70% of the salary of Mr. Harry Jenkins who was an employee of Bell Oil & Gas Company at the time he was also an officer of Mid-Tex Development Company; that Mr. Herbert Rothstein

did represent to Mr. J. W. Love in the May, 1962 long distance telephone conversation, Mr. Love then being Credit Manager for Texas Gas Corporation, that Bell Oil & Gas Company would protect Texas Gas Corporation in return for its extending credit to Mid-Tex Development Company and thereby induced Texas Gas Corporation to extend continued credit to Mid-Tex Development Company; that Lubell and Company and Bell Oil & Gas Company so used their respective stock ownership of Mid-Tex Development Company and Apollo Oil Company as to make those companies a mere agent, representative, adjunct, device, stooge or dummy through which Bell Oil & Gas Company in fact engaged in the retail distribution of oil and gasoline in Texas; that such representation by Mr. Rothstein to Mr. Love as above stated to induce Texas Gas Corporation to extend credit to Mid-Tex Development Company was made to Texas Gas Corporation and that such corporation alone was entitled to rely on such representation in extending credit to Mid-Tex Development Company and that Allied Chemical Corporation, as such, had no knowledge of such representation and was not entitled to rely thereon; that no conspiracy or joint venture was existent as between or among any of the defendants; that there has been no fraud practiced by any of defendants against the plaintiff; that Mid-Tex Development Company and Bell Oil & Gas Company are indebted to Allied Chemical Company in the amount of Sixty-Two Thousand Eight Hundred Seventy-Seven and .13/100 Dollars ($62,877.13), and that Apollo Oil Company and Bell Oil & Gas Company are indebted to Allied Chemical Company in the amount of Thirty-Three Thousand Two Hundred Fifty-One and .38/100 Dollars ($33,-251.38); * * *"

On request, additional findings were filed:

"1. That Bell Oil & Gas Company made no written agreement to pay Allied Chemical Corporation, directly or indirectly, for petroleum products furnished or to be furnished by Allied Chemical to Mid-Tex Development, Inc. or Apollo Oil Company.

"2. That the only written agreements covering the sales of petroleum products by Allied Chemical Corp. to Mid-Tex Development, Inc. or Apollo Oil Co. are contained in Defendant's Exhibits Nos. 5 and 6, introduced at trial.

"3. That there was no agreement made orally modifying the terms of the written agreements as contained in said Defendant's Exhibits Nos. 5 and 6.

"4. That any statement or representation made by Mr. Rothstein to Mr. Love regarding the payment of the Mid-Tex account to Texas Gas Corporation was made to Texas Gas Corporation only and it alone was entitled to rely on any such representation.

"5. That at the time Allied Chemical Corporation acquired the principal assets of Texas Gas Corporation the account of Mid-Tex Development, Inc. with Texas Gas Corporation was current.

"6. That Lubell & Company was a limited partnership which owned a majority of the stock of Mid-Tex Development, Inc. during the time material to the suit in question.

"7. That Bell Oil & Gas Co. never owned any stock in Mid-Tex Development, Inc.

"8. That prior to making any sales of petroleum products to Apollo Oil Company by Allied Chemical Corporation the latter was advised through Mr. Love, its Credit Manager, by Bell Oil & Gas Company that it was not responsible for and would not pay or guarantee the payment of the account of Mid-Tex Development, Inc.

"9. That no sales of petroleum products were made to Apollo Oil Company by Allied Chemical Corporation until after the time that Bell Oil & Gas Company had refused to pay or guarantee the payment of the account of Mid-Tex Development, Inc.

"10. That Bell Oil & Gas Company was a substantial creditor of Mid-Tex Development, Inc. during the years material to the suit in question.

"11. That during the twelve month period from June 1, 1963 to May 31, 1964 on sales of petroleum products by Allied Chemical Corporation to Mid-Tex Development, Inc. the latter paid a total of approximately $475,000.00 to Allied Chemical on such sales.

"12. That no demands or requests for payment of the Mid-Tex account were made by Allied Chemical Corporation to Bell Oil & Gas Company until the long distance telephone calls of Mr. Love of Allied Chemical to Mr. Lubell and Mr. Rothstein in April, 1964.

"13. That the majority of the unpaid portion of the Mid-Tex account and all of the Apollo account were incurred after the telephone conversation between Mr. Love and Mr. Lubell in April, 1964.

"14. That Allied Chemical Corporation never sent any bills or statements or made any written demands on Bell Oil & Gas Company to pay the accounts of Mid-Tex Development, Inc. or Apollo Oil Company other than a letter from Mr. Love to Mr. Rothstein introduced at trial as Plaintiff's Exhibit No. 1.

"15. That during the period of time that Allied Chemical Corporation sold petroleum products to Mid-Tex Development, Inc. and subsequently to Apollo Oil Company, the Defendant, Bell Oil & Gas Company, received no payments or credits from Mid-Tex Development, Inc. on its indebtedness owed to Bell Oil & Gas Company.

"16. That Bell Oil & Gas Company did not misrepresent to Allied Chemical Corporation its corporate structure or its relationship with Mid-Tex Development, Inc. or Apollo Oil Company.

"17. That Allied Chemical Corporation did not learn the corporate relationship between Bell Oil & Gas Company and Apollo Oil Company until after Allied Chemical had made all the sales of petroleum products to Apollo Oil Company which are the basis of this suit as to Apollo.

"18. That Bell Oil & Gas Company did not conspire with Mid-Tex Development, Inc. or Apollo Oil Company to induce sales by Allied Chemical Corporation to Mid-Tex or Apollo.

"19. That Bell Oil & Gas Company did not exercise joint operation and control with Mid-Tex Development, Inc. or Apollo Oil Company in their respective business operations.

"20. That the day to day business and business records of Bell Oil & Gas Company were kept separate from that of Mid-Tex Development, Inc. and Apollo Oil Company.

"21. That the Board of Directors' meetings and Stockholders' meetings of Bell Oil & Gas Company were not held jointly or at the same time or place with Mid-Tex Development, Inc. or Apollo Oil Company.

"22. That neither Mid-Tex Development, Inc. nor Apollo Oil Company represented to Allied Chemical Corporation that it was a subsidiary or division of Bell Oil & Gas Company."

Defendant's Exhibits 5 and 6 referred to in the court's findings of fact were contracts dated April 8, 1963, and June 6, 1963, between Allied Chemical and Mid-Tex, whereby Mid-Tex agreed to buy all of the gasoline for certain service stations at specified prices from Allied Chemical. Allied Chemical agreed to furnish paint and

equipment needed to brand the stations with the Allied Chemical's Tex-Gas color scheme and to furnish equipment to initiate a credit card system.

The only finding directly attacked by a point of error is that portion of the judgment reading:

"* * * that Lubell and Company and Bell Oil & Gas Company so used their respective stock ownership of Mid-Tex Development Company and Apollo Oil Company as to make those companies a mere agent, representative, adjunct, device, stooge or dummy through which Bell Oil & Gas Company in fact engaged in the retail distribution of oil and gasoline in Texas; * * *."

Mid-Tex Development Company was organized in Texas in 1956 with a capitalization of $1,000.00, the stock being owned one-half by Lubell & Company, a limited partnership of Tulsa, Oklahoma, and one-half by Harry K. Webb, Jr., of Dallas, Texas. The directors were Herbert Rothstein and Benedict Lubell (partners in Lubell & Company), Harry K. Webb, Jr. and Ralph Pulley. Webb was already engaged in the gasoline marketing business. Mid-Tex did not become active until 1958 or 1959, when its capitalization was raised to $5,000.00 and the ownership changed to 51% to Lubell & Company, 48% to Webb, and 1% to Pulley. The original officers were Harry K. Webb, Jr., as president, Harry C. Jenkins as vice president, Ralph Pulley as secretary-treasurer, Benedict Lubell as assistant treasurer, and Herbert Rothstein as assistant secretary. Mid-Tex had its office in Dallas and engaged in the retail marketing of gasoline through service station outlets in Nebraska, Missouri, Oklahoma, Arkansas, and Texas.

Bell Oil was incorporated in Oklahoma and is in the business of refining and marketing gasoline and petroleum products. It does no business in Texas under its own name, but operates a chain of retail gasoline stations through its wholly owned subsidiary, Bell Stations, Inc. During the period material to this suit, two of the principal officers of Bell Oil were Benedict Lubell and Herbert Rothstein. A majority of the common stock of Bell Oil was owned by the partners in Lubell & Company.

Herbert Rothstein was a director and the assistant secretary of Mid-Tex, a partner in Lubell & Company, and vice president of Bell Oil. Benedict Lubell was a partner in Lubell & Company, the executive vice president of Bell Oil, and a director and assistant treasurer of Mid-Tex.

After Mid-Tex became operative, most of its petroleum products were purchased from Bell Oil. Prior to 1961 the volume of its business had increased to the point that its monthly purchases were in the vicinity of $400,000.00. In 1961 Harry Webb, the operating manager of the business, disappeared, leaving his indorsed stock certificates on his desk indorsed in blank. Nothing was done about the certificates except to put them in a safe place. Mr. Pulley's certificate was also acquired. The offices vacated by Mr. Webb and Mr. Pulley were not filled. In 1963 Mr. Jenkins was elected president of Mid-Tex, but no new directors were elected.

After Webb disappeared, an audit of the books of Mid-Tex revealed a very large shortage in its accounts. At this time Mid-Tex owed Bell Oil $1,000,000.00 on open account for gasoline sales. While it is apparent that the corporation was insolvent, Bell took no action against Mid-Tex. Harry K. Jenkins undertook to operate Mid-Tex, receiving his instructions from Mr. Rothstein. Mr. Rothstein became the only one authorized to sign checks for Mid-Tex. Mr. Jenkins had been a sales representative of Bell Oil in Oklahoma. When he moved to Texas to become active in Mid-Tex, Bell Oil continued to pay $700.00 on his salary. Mid-Tex paid him $300.00. Mr. Jenkins was originally sent to Texas to look after Bell Oil's interest in Mid-Tex because of the large debt outstanding.

There was testimony that the purpose of continuing to operate Mid-Tex was to pay the debt to Bell Oil. In 1961 Mid-Tex sold its service station equipment to Oriole Oil Company for $1,000,000.00, and at least $496,029.00 of this money was paid to Bell Oil on its account. Oriole Oil Company is an Oklahoma corporation. The officers, directors, and stockholders of this corporation were the partners, associates, and their wives of the Oklahoma law firm who for many years had represented Lubell & Company, Bell Oil, and its subsidiaries. Oriole borrowed substantially all of the money required to make this investment. Oriole leased the stations to Bell Oil on a long-term lease. Bell, in turn, subleased back to Mid-Tex. The lease payments were about $12,000.00 per month. There was an option to Lubell & Company or Bell Oil to purchase the stations at the end of the ten year term.

Thereafter the debt owed by Mid-Tex to Bell Oil increased because of failure to make rental payments. Under instructions from Mr. Rothstein, Mid-Tex assigned its stations in north Texas to Bell Stations, Inc. and moved its headquarters to San Antonio.

In May, 1962, Mid-Tex sought to buy petroleum products from Texas Gas Corporation. The credit manager, J. W. Love, refused to approve their application. After talking to the Texas Gas sales manager, Mr. Love called Bell Oil in Tulsa and asked to speak to Mr. Lubell, but was referred to Mr. Rothstein. Mr. Love testified that Mr. Rothstein told him that Bell Oil and Gas would see to it that if they sold to Mid-Tex on credit, their invoices would be paid. Texas Gas sold petroleum products to Mid-Tex on open account thereafter. The invoices were promptly paid by checks signed by Mr. Rothstein. Texas Gas sold its assets to Allied Chemical as of December 31, 1962. At that time the Mid-Tex account was up to date.

By May, 1962, the leases on all the stations except those in Texas had been transferred to Bell Stations, Inc., on the instructions of Mr. Rothstein because Mid-Tex had not paid the rentals.

In 1964 Apollo Oil was incorporated with Bell Oil owning all the capital stock. It was organized to operate service stations. The former employees, or officers, of Mid-Tex, Harry Jenkins, John E. Kirkpatrick, and Clyde E. Crawford, became the officers and directors of Apollo. All of the stations operated by Apollo were transferred to it by Mid-Tex. The capitalization of Apollo was $1,000.00. The only consideration paid to Mid-Tex was the invoice price of the petroleum products on hand. Later when Apollo was unable to operate the stations profitably, they were transferred to Bell Stations, Inc.

After the disappearance of Mr. Webb, apparently there were no meetings of the Board of Directors of Mid-Tex. There were only two members of the Board other than Webb and Pulley. The affairs of the corporation were handled by Rothstein. The only reason for its continued existence was to pay its obligation to Bell Oil.

Both Mid-Tex and Apollo used the insignia of Bell Stations, Inc. when it was convenient to do so although there was no written or oral agreement permitting this arrangement.

All of the billing or invoicing by Allied Chemical for its sales to Mid-Tex, and later to Apollo, went to these companies, and not to Bell Oil. In 1963 Mid-Tex began to get behind in its payments to Allied Chemical. Mr. Love, the credit manager, had left the employment of Texas Gas, but returned to Allied Chemical in June, 1963. At that time Mid-Tex owed Allied Chemical $80,000.00 to $90,000.00. Allied Chemical continued to supply Mid-Tex until June, 1964, when the balance was $62,877.13. In April, 1964, Mr. Love called Lubell and Rothstein in Tulsa about the accounts. Bell Oil refused to pay the accounts and denied any responsibility for the account.

All of the money generated by Mid-Tex, and subsequently by Apollo, was used to pay salaries, utility bills, ad valorem taxes, ground rents of the stations, and the suppliers of gasoline. It must be noted, however, that Bell Oil was primarily liable for the ground rents. While Apollo paid Mid-Tex $20,000.00 for the petroleum products on hand when the stations were transferred to it, and Mid-Tex paid the $20,000.00 to Allied Chemical on the open account debt, this money was generated through the sale of the products purchased. Apollo also purchased gasoline from Allied Chemical in the total sum of $33,251.38, and made no payments on this account. Mr. Lubell testified that Apollo paid Bell $26,215.00 in May, 1965, for equipment rental.

In the petition on which the case went to trial, Allied Chemical alleged liability on the part of Bell Oil alternatively under theories of joint venture, conspiracy and sham (alter ego). The trial court found that there was no conspiracy or joint venture. The judgment necessarily rests on the finding that "Lubell & Company and Bell Oil & Gas Company so used their respective stock ownership of Mid-Tex Development Company and Apollo Oil Company as to make these companies a mere agent, representative, adjunct, device, stooge or dummy, through which Bell Oil & Gas Company in fact engaged in retail distribution of oil and gasoline in Texas." The trial court found that none of the defendants had practiced any fraud against Allied Chemical and that neither Mid-Tex nor Apollo was used to justify a wrong as to Allied Chemical.

In Continental Supply Co. v. Forrest E. Gilmore Co. of Texas, 55 S.W.2d 622 (Tex. Civ.App., Amarillo 1932, writ dism.), the court said:

"The legal fiction of the separate entities of two corporations, the stock of which is owned by the same parties, should be disregarded when necessary for the prevention of fraud or to protect the legal rights of third parties. Upon ascertainment of all the facts, it is the prerogative of the court and not the jury to look through the forms to the substance of the relations existing between the corporations. Williams v. Freeport Sulphur Company (Tex.Civ. App.) 40 S.W.(2d) 817; Oriental Investment Co. v. Barclay, 25 Tex.Civ.App. 543, 64 S.W. 80; Buie v. Chicago, etc., Ry., 95 Tex. 51, 65 S.W. 27, 55 L.R.A. 861; Fowler v. Small (Tex.Civ.App.) 244 S.W. 1096, 1097; O'Neal v. Jones (Tex. Civ.App.) 34 S.W.(2d) 689; 14 C.J. 61, § 22; Id. 62, § 25; 10 Tex.Jur. 648, § 49.

"Upon ascertainment of the facts, the courts will disregard the fiction of corporate entity where the fiction (1) is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong."

These paragraphs of the opinion were quoted with approval in Pacific American Gasoline Co. of Texas v. Miller, 76 S.W.2d 833 (Tex.Civ.App., Amarillo 1934, writ ref.).

In Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340 (1955), the Court said:

"Courts will not disregard the corporation fiction and hold individual officers, directors or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations. Hildebrand on Corporations, Vol. 1, sec. 5, pp. 31–44; 18 C.J.S., Corporations, §§ 6 and 7, pp. 376–385; 13 Am.Jur. pp. 160–163, Corporations, sec. 7 and 8."

Dean Ira P. Hildebrand, in the work cited above (Hildebrand on Corporations, Vol. 1, Sec. 5, pp. 32–35), says:

"But whatever name may be given to this legal concept, as a practical matter a corporation is in reality an association of persons, and no judicial dictum or legislative enactment can alter this fact. The conception of corporate entity was given to this group of persons for a purpose, as a formula for working out the rights of real parties in interest, and for convenience in making contracts, in the acquisition of property, and to preserve limited liability of stockholders. Since a corporation is looked upon as a legal entity for a purpose, when that purpose is abused, a court is under no duty to continue to regard the corporate entity, and may consider the corporation as an aggregate of persons.

"As Professor Ballantine suggests, the problem of responsibility of acts of a corporation or stockholders is to be solved not by disregarding the corporate entity, but by a study of the just limitations on the exercise of the legal privileges of separate capacity.

"Where a corporation is organized and used for legitimate business purposes, it will be looked to as a separate legal entity, but courts will not sanction its use in such instances where the rights of innocent parties will be defeated.

"Professor Wormser gives the nearest approach to a generalization that is available as to when the concept of corporate entity should be ignored: 'When the conception of corporate entity is employed to defraud creditors, to evade an existing obligation, to circumvent a statute, to achieve or perpetuate monopoly, or to protect knavery or crime, the courts will draw aside the web of entity, will regard the corporate company as an association of live, up-and-doing, men and women shareholders, and will do justice between real persons.' This statement of the law has been frequently followed by the courts.

"The modern tendency of courts is to disregard the corporate entity when same is invoked as a means of protection against fraud, where the corporate organization is illegally conducted, where the corporation is used as a mere sham and devise to protect individuals against liability, where the corporation did not exist except practically as a shadow of the individual, where the corporate entity is used to evade existing legal obligations, where the corporate and individual transactions have not been distinct, * * *'"

The question of disregarding the corporate fiction was discussed at length in State v. Swift & Co., 187 S.W.2d 127 (Tex.Civ.App., Austin 1945, writ ref.). There the court said:

"Just when a corporation will be regarded as the adjunct, creature, instrumentality, device, stooge, or dummy of another corporation is usually held to be a question of fact in each case. As above stated the general rule is that the separate corporate entity of corporations will be observed by the courts, even though one may dominate or control another, or may treat it as a mere department, instrumentality, agency, etc.; and courts will disregard the separate legal identities of the corporations only when one is used to defeat public convenience, justify wrongs, protect fraud or crime of the other. (Citing cases) These cases discuss at length proper methods or standards of handling relations between a parent and a subsidiary corporation so as to prevent their separate corporate identities from being disregarded by the courts. After reviewing particularly the Berkey case, Mr. Justice Douglas, before going on the bench, wrote an article for 39 Yale L.J. 193, in which such methods or standards are summarized as follows:

"'The observance of the following four standards will keep the business

units from being treated as assimilated: (1) A separate financial unit should be set up and maintained. That unit should be sufficiently financed so as to carry the normal strains upon it. * * * (2) The day to day business of the two units should be kept separate. * * * And in addition the financial and business records of the two units should be separately kept. (3) The formal barriers between the two management structures should be maintained. The ritual of separate meetings should be religiously observed. The activities of the individuals serving on the two boards can be tagged so that the individuals qua directors of the subsidiary can always be distinguished from the same individuals qua directors of the parent. Such tagging is not pure fiction. It draws the line that keeps the dual capacities separate and distinct. It conforms to the habit of thought which accepts the fact of dual capacity but which demands a separation of conduct so that each act may be clearly categorized. Separate meetings of the boards are sufficient. The same problem arises in connection with the officers. And the same solution suggests itself. A man may not be indiscriminately one officer or another. The observance of the niceties of business efficiency are normally sufficient. Such demands are not exacting. They merely suffice to keep the record of the business affairs of the two units from becoming hopelessly intermingled. (4) The two units should not be represented as being one unit. Those with whom they come in contact should be kept sufficiently informed of their separate identities.' "

The controlling stock of Bell Oil and Mid-Tex was owned by the same people. All of the stock of Apollo was owned by Bell Oil. A reasonable inference from the evidence is that the only reason for the continued existence of Mid-Tex after Webb left was to aid Bell Oil by paying the debt owed it and paying the equipment rental for which Bell Oil otherwise would be liable to Oriole.

It appears that two of the standards, suggested by Mr. Justice Douglas in the article quoted, for preventing business units from being assimilated, were not met in the case. Neither Mid-Tex nor Apollo was sufficiently financed. The formal barriers between the two management structures were not maintained. In the case of Mid-Tex it appears that no meetings of the Board of Directors were held after Webb resigned. It is a fair inference that the activities of Rothstein as an officer in the various interrelated business organizations were not kept distinct. The fact that Jenkins was an employee of Bell Oil and received his principal salary from that company while serving as the chief executive officer of Mid-Tex and Apollo is suspect in view of the assignment of the subleased stations and equipment leases to Bell Stations, Inc., and Apollo, without any monetary consideration, and by reason of the fact that Apollo paid the sublease rentals to Bell Oil in preference to the purchase price of the petroleum products bought from Allied Chemical.

The trial court after considering that (1) the operation with Mid-Tex was unprofitable, and (2) the capitalization of Apollo was inadequate, might well have concluded that Apollo was organized solely for the purpose of avoiding liability on the part of Bell Stations, Inc. or Bell Oil, in the operation of the stations since it was necessary that the stations be operated to minimize the loss on the station and equipment leases from Oriole.

These circumstances support the finding of the trial court that Mid-Tex and Apollo constituted representatives, devices, or dummies through which Bell Oil engaged in the retail distribution of oil and gasoline in Texas.

The judgment of the Trial Court is affirmed.