## ACME PEST CONTROL CO., Inc. v. YOUNGMAN.

### No. 2819.

Court of Civil Appeals of Texas
Tenth District, Waco.

Nov. 4, 1948.

Bill Prewett, of Corpus Christi, for appellant.

Patrick J. Horkin, Jr. and Jerry D'Unger, both of Corpus Christi (J. Marvin Ericson, of Corpus Christi, on appeal only), for appellee.

LESTER, Chief Justice.

Prior to February 15, 1946, the plaintiff, Henry Youngman, was the owner of the Acme Pest Control Company, Inc. He needed funds to carry on and to expand his business and placed an advertisement in the local paper for a partner who would be willing to place sufficient funds in said business so as to accomplish said purpose. The defendant H. E. Dysart responded to the ad, and on February 15, 1946, the plaintiff and the defendant Dysart entered into a partnership agreement, the result of which the said Dysart put $3000.00 into said business. In May of the same year the business was incorporated with a capital stock of $6000.00, and on or about the 1st of December, 1946, the plaintiff and defendant entered into the following contract:

"An Agreement made this 1st day of December, 1946, between Acme Pest Control Company, Inc. (hereinafter called Acme) and Henry Youngman (hereinafter called H. Y.) both of Corpus Christi, Texas, whereas:

1. H. Y. agrees to sell and Acme agrees to buy H. Y.'s stock and interest in the Acme.

2. Acme agrees to pay H. Y. for such stock and interest and for service rendered, $1,000.00 (One thousand dollars) cash and $150.00 per month (without interest) for a period of nine years, or a deferred consideration of $16,200.00 making a total purchase price of $17,200.00. The $1,000.00 to be paid on the signing of this contract and the payment of $150.00 per month to be paid beginning the 1st of January, 1947.

3. Should the Acme at any time decide to pay the full amount outstanding then a 33-1/3 per cent discount is allowed.

4. The payment due under this contract shall constitute a lien on the assets of the Acme, which today has a value of $6,000.00 or more.

5. H. Y. agrees to sublet to Acme, the building at 3003 Agnes St., plus 1000 square feet outside space, at a monthly rent of $115.00 payable in advance starting December 14th, 1946.

6. Acme agrees to rent the building for one year with yearly option of renewal until December 14th, 1950. Sixty days notice is required to take up such option.

7. It is acknowledged that H. Y. as of today's date does not owe anything to the Acme.

8. H. Y. agrees to help the Acme take over his sole right (verbal) for this territory to buy 'Termicide' from Barber Laboratories, New Orleans, La.

9. H. Y. agrees not to engage in the manufacture of Pest Control Chemicals for a period of three years.

10. H. Y. will continue to service certain residential customers for the Acme.

11. H. Y. agrees to vacate the building at 3003 Agnes St., on or before January 15, 1947.

In Witness whereof the parties have this 1st day of December, 1946, affixed their names and seals.

Acme Pest Control Company, Inc.

(Signature) Homer E. Dysart.

Henry Youngman
(Signature)

For value received, we hereby guarantee the payment of above mentioned obligation.

Guarantee accepted:

Henry Youngman
(Signature)."

A few days later a further agreement was entered into between the plaintiff and defendant, which was made in connection with and based upon the same consideration as was the first agreement. Said agreement is as follows:

"An agreement made this day between Acme Pest Control Co. Inc. (hereinafter called Acme) and Henry Youngman (hereinafter called H. Y.) whereas:

1. Acme will sell their Velsicol 1068 and other products through H. Y.

2. Where Acme's products are sold in the name of Acme, H. Y. acts as sales manager for Acme.

3. Attached sheets specifies what commission H. Y. will receive, or the prices H. Y. pays Acme.

4. This agreement does not prevent Acme from selling outside H. Y., and he gets no commission on such deals, but to connections obtained by H. Y. Acme can only sell through him.

5. H. Y. agrees not to manufacture any pest control chemicals that Acme is manufacturing.

6. H. Y. is to retain his residential clients in pest control service in Victoria.

7. H. Y. (or his firm, probably to be called Acme Chemical Co.) is given a cabinet space in Acme's office and allowed the use of Acme's telephone.

Corpus Christi, Texas, December 1, 1946.

Acme Pest Control Co. Inc.

Homer E. Dysart,        Henry Youngman

Henry Youngman, Pres.  (Henry Youngman)."

The defendant paid to the plaintiff the monthly payments of $150.00 for January, February and March of 1947, as provided in the contract, but on account of the breach of the contract on the part of the plaintiff, the defendant refused to make further payments.

Plaintiff filed suit to recover the sum of $15,750.00, representing the balance of the deferred payments provided in the contract, and sued Dysart as guarantor. The defendant defended on the ground that the plaintiff had breached the contract in several material matters prior to the refusal on the part of the defendant to make further payments, and tendered the corporate stock that it had received under the agreement and prayed for cancellation of the contract and for recovery of the sums paid under the same.

The court submitted the case to the jury upon special issues. Among other things the jury found, in answer to Special Issue No. 8, that the plaintiff did not fail to sublet the building at 3003 Agnes Street to the defendant Acme Pest Control Company, Inc. and Homer E. Dysart; and to Issue No. 9 the jury found that the plaintiff failed to vacate said building on or before January 15, 1947. After the verdict of the jury the defendant filed a motion for judgment non obstante veredicto, alleging that the undisputed evidence showed that the plaintiff did not sublet the premises as provided in the contract. The court overruled said motion and entered judgment for the plaintiff for the amount sued for. Thereupon the defendants filed a motion for new trial, and the same being overruled, perfected their appeal. The appellee has filed no brief.

Appellant's first four propositions are: that the court erred in entering said judgment for the reason that the evidence was clear and conclusive that the plaintiff breached the contract in two material matters, in failing to vacate the premises and in failing to sublet the premises to the defendant; that the plaintiff never had the legal right to sublet the same and never made any attempt to obtain such right; that the answer of the jury to Special Issue No. 8 had no support in the evidence; and since the plaintiff had first breached the contract, he was in no position to maintain a suit for damages.

The evidence clearly shows without contradiction that the plaintiff did not sublet the premises in question but that he refused to do so upon the request of the defendant. In the first place, he had no right to sublet the premises without the written consent of his landlord, which he did not have and made no attempt to secure. The lease contract for the premises provided: "Lessees are hereby granted the permission to transfer or assign this lease or sublet part of the building and land with the written consent of the lessors regarding the financial ability of the sub or new lessee." In this connection the plaintiff testified:

"Q. Did you have any written consent of Mr. Isenberg? A. As to what?

"Q. To sublet or assign that lease? A. I didn't sublet my lease. There was no reason for written consent for it.

"Q. You didn't sublet it? A. I subrented part of it, and as I kept on paying the rent I didn't see that that question had any bearing on the matter of finances. I was still there and still paying rent myself so I considered I was entitled to do what I did without any agreement from Isenberg."

Plaintiff further testified that he did not ask his landlord for permission to assign his lease or sublet the premises; that he requested the defendants to vacate and they moved during the month of March, 1947. Sam Isenberg, the owner of the premises, testified as follows:

"Q. Did you have a lease agreement with Mr. Youngman? A. Yes sir.

"Q. Did it come to your attention that other parties were using the building? A. Yes sir.

"Q. When did it first come to your attention? A. February of '47, I believe; yes sir, February of '47.

"Q. As a result of that what did you do? A. I wrote Mr. Youngman a letter and sent a copy to Mr. Dysart to put them on notice that I wasn't recognizing any re-assignment of the lease inasmuch as I had not given my written consent to Mr. Youngman to re-assign this lease.

"Q. Did you give written consent to Mr. Youngman to sub-let part of that building to Mr. Dysart? A. No sir.

"Q. Did he request that you do it? A. No sir."

The letter above referred to was introduced in evidence. It was dated February 15, 1947, and was as follows:

"Mr. Henry Youngman,
Corpus Christi, Texas.

Dear Sir:

I acknowledge the receipt of your check in the amount of $115.00 for rent to March 15, 1947. Mr. Youngman, it has been brought to my attention that you were assigning your lease to Mr. H. E. Dysart, under the terms of your lease you have no right to assign this lease without my written consent, therefore, I would not be willing to recognize any assignment you may make or contemplate making.

Yours very truly,

cc: Mr. H. E. Dysart.      Sam Isenberg."

The evidence shows without dispute that after the refusal of the plaintiff to sublet or assign his lease, the defendant made an effort to get the consent of Isenberg for the subletting of the premises, but was unable to do so.

The plaintiff being in default in that he first breached his contract in at least two material matters, in failing to sublet the premises and failing to vacate the same as provided in said contract, did such conduct on his part give the defendant the right to rely upon such breach as discharging it from performing its obligation imposed by the terms of said agreement? Whether a covenant in a contract is de-

pendent or independent depends upon the intention of the parties as determined from the language used. The presumption is that all stipulations in a contract are dependent and a promise will be so regarded in case of doubt. 10 T.J. 327, sec. 187; 17 C.J.S., Contracts § 344b, p. 798; Investors' Utility Corporation v. Challacombe, Tex. Civ.App., 39 S.W.2d 175; Reitzer v. Med-Telegraph Co., 95 Tex. 63, 69 S.W. 63. lake Development Co., Tex.Civ.App., 27 S.W.2d 563; Rigsby v. Boone County State Bank, Tex.Civ.App., 241 S.W. 207. The plaintiff prepared the agreement and its construcion should be most strongly against him. 17 C.J.S., Contracts, § 324, p. 751; 10 T.J. p. 277; Phillips v. Western Union Telegraph Co., 95 Tex. 638, 69 S.W. 63. The defendant agreed to pay the plaintiff a total sum of $17,200.00, of which $1000.00 was paid in cash, the balance of $16,200.00 to be paid at the rate of $150.00 per month for a period of nine years, and it received therefor the plaintiff's minority block of stock and a promise upon the part of plaintiff that he would perform certain obligations for the above mentioned consideration. The contract does not place a valuation on any of the obligations imposed upon the plaintiff, nor does the evidence shed any light in this respect, but it appears that the concurrent and mutual obligations were the consideration for the entire contract. The plaintiff transferred his stock to the defendant as per agreement, but he failed to sublet the premises and also refused to vacate the same, as he had agreed to do. It does not seem plausible that the defendant would have entered into a contract whereby it agreed to pay the plaintiff the sum of $17,200.00 for a minority block of stock in the corporation, the assets of which, under the agreement, were approximately $6000.00; but we are of the opinion that the defendant relied upon the agreement of the plaintiff to carry out his part of the contract, and each covenant thereof went to the entire consideration and was the inducing cause of the defendant entering into said agreement, and that each covenant contained therein is dependent upon the other. Such being the facts, without any supervening equity, plaintiff was in no position to maintain a suit for its breach. As a general rule, a party to an indivisible contract cannot enforce it or recover damages for its breach unless he shows that he has performed the obligations imposed upon him, or that he offered to perform them and was able to do so, or unless he shows some valid excuse for failure to perform. 10 T.J. p. 395, sec. 224; Gulf Pipe Line Co. v. Nearen, 135 Tex. 50, 138 S.W.2d 1065; Smith v. Fort, Tex.Civ. App., 58 S.W.2d 1080; Jessen v. Le Van, Tex.Civ.App., 161 S.W.2d 585; Rigsby v. Boone County State Bank, Tex.Civ.App., 241 S.W. 207; Frankfurt Finance Co. v. Treadaway, Tex.Civ.App., 159 S.W.2d 514; Investors' Utility Corporation v. Challacombe, Tex.Civ.App., 39 S.W.2d 175.

Therefore, the judgment of the trial court is hereby reversed and judgment rendered cancelling the contract, and judgment is also rendered for the defendant and against the plaintiff in the sum of $1450.00, representing the amount the defendant has heretofore paid to the plaintiff upon said contract. It is the further judgment of this court that the defendant deliver and transfer to the plaintiff the corporate stock it received from him under said contract.