**BELL OIL & GAS COMPANY, Petitioner,**

v.

**ALLIED CHEMICAL CORPORATION,**
**Respondent.**

**No. B–662.**

Supreme Court of Texas.

July 17, 1968.

Rehearing Denied Oct. 2, 1968.

Andrews, Kurth, Campbell & Jones, Bass C. Wallace, Houston, for petitioner.

Vinson, Elkins, Weems & Searls, B. Jeff Crane, Jr., Theodore Crowell, Houston, for respondent.

NORVELL, Justice.

The trial court rendered judgment in favor of plaintiff, Allied Chemical Corporation, and against Mid-Tex Development Company and Bell Oil & Gas Company, jointly and severally, for the sum of $62,-877.13, and against Apollo Oil Company and Bell Oil & Gas Company, jointly and severally, for $33,251.28. The Court of Civil Appeals affirmed. 420 S.W.2d 779.

We reverse the judgment insofar as the Bell Company is concerned and here render judgment that Allied Chemical Corporation take nothing against said Bell Oil & Gas Company. As Mid-Tex Development Company and Apollo Oil Company did not appeal, the trial court's judgment against them is left undisturbed.

As stated by the Court of Civil Appeals, the principal question in the case relates to the liability of Bell Oil & Gas Company for debts incurred by an affiliated corporation, Mid-Tex Development Company, and a subsidiary corporation, Apollo Oil Company. Lubell & Company, a limited partnership, was originally a party to the suit but was dismissed therefrom. Benedict Lubell and Herbert Rothstein were two of the partners in Lubell & Company, an investment firm. Bell Oil & Gas Company, a corporation, is owned by a Lubell family foundation and individual members of the Lubell family. Its chief fiscal officer is Benedict Lubell, executive vice-president. Herbert Rothstein is also a vice-president of this corporation. Lubell and Bell are both based in Oklahoma.

Mid-Tex Development Company was organized in 1956 by Harry Webb, a gasoline retailer, and Lubell & Company, each owning one-half the stock. This corporation operated in Texas and was managed by Webb until 1961 when he disappeared and thereafter an audit of the books disclosed a large shortage in the company's accounts. Webb left his Mid-Tex stock certificates duly endorsed, in the company's office when he disappeared. These certificates were held as treasury stock and Lubell & Company thereafter became the owner of all the outstanding stock.

Apollo Oil Company, a corporation, was organized in 1964. Essentially, it was a successor to Mid-Tex, although its corporate stock was held by Bell rather than by Lubell & Company. Mid-Tex and Apollo have the same officers.

After Webb left, Harry Jenkins, vice-president, took over the management of Mid-Tex. Jenkins occupied the position of an Oklahoma sales representative with Bell, but after 1961, he devoted his time to the management of Mid-Tex. However, he received 70% of his salary from Bell while managing Mid-Tex, although after he left Oklahoma, he did not receive the standard increases nor year-end bonuses from Bell.

Benedict Lubell served as assistant treasurer and Rothstein as assistant secretary of Mid-Tex, and that company maintained a working account and a general account with a Houston bank. Jenkins was authorized to draw checks on the working or office expense account while Rothstein was empowered to draw checks on both accounts. Apollo handled its bank accounts in much the same way although Jenkins was authorized to sign checks on both accounts. The general practice of both corporations was for Jenkins to forward checks to Tulsa for Rothstein's signature as soon as invoices were received. These checks were signed by Rothstein and returned. They were held by the company until there was a sufficient amount in the bank to cover them when they would be delivered to the creditor.

For our present purpose, the above statement of the relationship between and among the Lubell-Rothstein corporations is deemed sufficient. The Court of Civil Appeals' opinion contains a more detailed account and sets forth in full the trial court's findings of fact. Undoubtedly, there was a close connection between Bell, Mid-Tex and Apollo. A number of directors and officers of Bell were also directors and officers of Mid-Tex and Apollo. While Bell held no Mid-Tex stock, Benedict Lubell and Herbert Rothstein were interested in Lubell & Company which in turn owned the Mid-Tex stock. However, the parties seem agreed that:

"As a general rule, the fact that a corporation owns all or the majority of the stock of another corporation does not destroy the identity of the latter as a distinct legal entity. A holding or parent corporation has a separate entity, in the absence of circumstances justifying disregard of the corporate entity. The subsidiary corporations, too, are ordinarily independent of each other. The fact that the stockholders or officers in the two corporations may be the same persons does not operate to destroy the legal identity of either corporation; nor does

the fact that the one corporation exercises a controlling influence over the other through the ownership of its stock or through the identity of stockholders make either the agent of the other or merge the two corporations into one." 18 Am.Jur.2d 564, Corporations, § 17.

It is necessary to examine in some detail the transactions had by Allied Chemical Corporation and its predecessor, Texas Gas Company, with Bell, Mid-Tex and Apollo. The asserted liability of Bell for the debts of Mid-Tex and Apollo is based upon contractual obligations and not upon fraud or some other tort. Allied does not attack the findings of the trial court by cross points, although in the arguments in its brief, some complaint is voiced with reference thereto. Certain of these findings will be mentioned later, but we here quote the following:

"16. That Bell Oil & Gas Company did not misrepresent to Allied Chemical Corporation its corporate structure or its relationship with Mid-Tex Development, Inc.[1] or Apollo Oil Company.

"17. That Allied Chemical Corporation did not learn the corporate relationship between Bell Oil & Gas Company and Apollo Oil Company until after Allied Chemical had made all the sales of petroleum products to Apollo Oil Company which are the basis of this suit as to Apollo.

"18. That Bell Oil & Gas Company did not conspire with Mid-Tex Development, Inc. or Apollo Oil Company to induce sales by Allied Chemical Corporation to Mid-Tex or Apollo.

"19. That Bell Oil & Gas Company did not exercise joint operation and control with Mid-Tex Development, Inc. or Apollo Oil Company in their respective business operations.

"20. That the day to day business and business records of Bell Oil & Gas Company were kept separate from that of Mid-Tex. Development, Inc. and Apollo Oil Company.

"21. That the Board of Directors' meetings and Stockholders' meetings of Bell Oil & Gas Company were not held jointly or at the same time or place with Mid-Tex Development, Inc. or Apollo Oil Company.

"22. That neither Mid-Tex Development, Inc. nor Apollo Oil Company represented to Allied Chemical Corporation that it was a subsidiary or division of Bell Oil & Gas Company."

The trial court filed the following conclusions of law:

"1. That there existed no conspiracy between Bell Oil & Gas Company and Mid-Tex Development, Inc. and/or Apollo Oil Company such that Bell Oil & Gas Company was liable for the debts of Mid-Tex or Apollo to Allied Chemical Corporation.

"2. That no joint venture existed between Bell Oil & Gas Company and Mid-Tex Development, Inc. and/or Apollo Oil Company such that Bell Oil & Gas Company was liable for the debts of Mid-Tex or Apollo to Allied Chemical Corporation.

"3. That there was no fraud practiced by any of the defendants against plaintiff in connection with any matters involved in the lawsuit.

"4. That the business operations of Mid-Tex Development, Inc. and/or Apollo Oil Company were not created or used to justify a wrong as to Allied Chemical Corporation."

The judgment of the trial court was rendered on November 26, 1966 and recited certain findings. Formal findings were

---

1. The judgment uses the designation, Mid-Tex Development Company. In the pleadings, both Mid-Tex Development Company and Mid-Tex Development, Inc. are used.

requested in accordance with Rule 296, Texas Rules of Civil Procedure. These were filed on February 27, 1967. As pointed out by the Court of Civil Appeals, the only finding or conclusion directly attacked by a point of error (which was urged by Bell) was one contained in the judgment, viz.:

"[T]hat Lubell and Company and Bell Oil & Gas Company so used their respective stock ownership of Mid-Tex Development Company and Apollo Oil Company as to make those companies a mere agent, representative, adjunct, device, stooge or dummy through which Bell Oil & Gas Company in fact engaged in the retail distribution of oil and gasoline in Texas; * * *."

While the language of the trial court's finding[2] contains a number of harsh sounding nouns following the word "agent," they add nothing to the proposition embraced in the finding because of the absence of a finding of fraud. The question presented is, were Mid-Tex and Apollo, despite their corporate forms, mere agents of Bell?[3]

In State v. Swift & Co., 187 S.W.2d 127 (Tex.Civ.App.1945, wr. ref'd), a penalty action brought by the State upon the theory that Consumers Cotton Oil Company, a Swift subsidiary, was actually a mere agency of Swift and hence Swift was doing business in Texas without a permit, the court said:

"The general rule seems to be that courts will not because of stock ownership or interlocking directorship disregard the separate legal identities of corporations, unless such relationship is used to defeat public convenience, justify wrongs, such as violation of the anti-trust laws, protect fraud, or defend crime. State v. Humble Oil & Refining Co., Tex. Civ.App., 263 S.W. 319 (writ ref.); Berkey v. Third Avenue Ry. Co., 244 N.Y. 84, 155 N.E. 58, 50 A.L.R. 599; Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634."

The court also quoted from and approved four standards or indicia of the existence of separate though subsidiary corporations contained in Douglas and Shanks, "Insulation From Liability Through Subsidiary Corporations," 39 Yale L.J. 193 (1929).[4]

*As to claims of contractual origin, it was stated by Professor Shanks that:*

"The attempt to hold a parent corporation where the claim asserted is of contractual origin presents added difficulties. The very reasonable question must be met and answered why one who contracted with the subsidiary and received the promise which he bargained for but who has been disappointed in the fulfillment

---

2. The language contained in the finding is taken from State v. Swift & Co., 187 S.W.2d 127 (Tex.Civ.App.1945, wr. ref'd.). The holding of the case was that Swift had not used its stock ownership of Consumers Cotton Oil Company so "as to make it the mere agent, representative, adjunct, device, stooge, or dummy through which in fact it operates the cottonseed oil mill and gin business in Texas without a permit to do so."

3. "The statement that the insulation will be broken down when the subsidiary is an 'agency,' 'adjunct,' 'instrumentality,' 'alter ego,' 'tool,' 'corporate double,' or 'dummy' of the parent is not helpful. These concepts themselves need defining. At best they merely state results.

And the results are significant only in light of the facts. * * *" Douglas and Shanks, "Insulation From Liability Through Subsidiary Corporations," 39 Yale L.J. 193, l. c. 195.
See also, Pelletier, "Annual Survey of Texas Law—Corporations," 21 Sw.L.J. 134 (1967); Ballantine, "Separate Entity of Parent and Subsidiary Corporations," 14 Cal.L.Rev. 12 (1925).

4. This article is divided into three parts, the first being introductory, the second relating to torts and the third relating to contracts. Parts I and II were written by W. O. Douglas (now a member of the Supreme Court of the United States), and Part III by Professor Carrol M. Shanks of the Yale School of Law.

by the subsidiary of its commitment should then be allowed to look to the parent. As a matter of contract right it is evident he may not. Additional compelling facts must appear." 39 Yale L.J. 193, l. c. 210.

■ The delineation of these essential "additional compelling facts" in the form of a general rule may prove troublesome. Dean Hildebrand has observed that, "What circumstances will be required in order to make one corporation a mere agent or tool in the hand of another so that the corporate entity will be disregarded, is difficult to determine." 1 Hildebrand, Texas Corporations 43 (1942). It seems reasonably certain, however, that the corporate arrangement must be one which is likely to be employed in achieving an inequitable result by bringing into operation a basically unfair device which in all probability will result in prejudice to those dealing with one or more of the units making up the corporate arrangement, or one which has actually resulted in the complaining party's having been placed in a position of disadvantage by the exercise of inequitable means, of which the corporate arrangement is a part.

■ We must start with the basic rule set forth in Pace Corporation v. Jackson, 155 Tex. 179, 284 S.W.2d 340 (1955), and reaffirmed by this court in Drye v. Eagle Rock Ranch, Inc., 364 S.W.2d 196, 202 (1962):

"Courts will not disregard the corporation fiction and hold individual officers, directors or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations."

In turning to the facts of this case, we find no evidence that Mid-Tex was originally incorporated for an illegal, improper or fraudulent purpose. It was organized as a gasoline retailer and operator of automobile service stations. It was not a financially successful venture. The corporation, however, bought and sold gasoline in large quantities. In 1961, it was indebted to Bell for gasoline purchased by it in the approximate sum of $1,000,000. In 1962, Mid-Tex began buying gasoline from Texas Gas Corporation which was a corporate predecessor of Allied Chemical. Texas Gas seems to have had doubts as to Mid-Tex' financial responsibility and its credit manager testified that before selling to Mid-Tex, he had a conversation with Rothstein who, according to the sales manager of Texas Gas, stated that "they," presumably Bell, would see to it that the Mid-Tex invoices were paid. Rothstein denied that such conversation took place, and however that may be, the trial court found that any representation made by Rothstein relating to the payment of the Mid-Tex account to Texas Gas was made to Texas Gas only and it alone was entitled to rely upon any such representation, and that when Allied Chemical acquired the principal assets of Texas Gas, the Mid-Tex account with Texas Gas was current. The trial court likewise found that prior to making any sales of petroleum products to Apollo by Allied Chemical, Bell had advised the credit manager of Allied Chemical that it was not responsible for and would not pay or guarantee the payment of the account of Mid-Tex; that during the twelve month period from June 1, 1963 to May 31, 1964, on sales of Allied Chemical to Mid-Tex, the latter paid a total of approximately $475,000 to Allied Chemical on such sales, and that the greater part of the unpaid portion of the Mid-Tex account and all of the Appollo account were incurred after the telephone conversation wherein Bell denied all liability for the Mid-Tex account.

In essence and briefly stated, the record shows that Lubell and Company, in which both Benedict Lubell and Herbert Rothstein were interested, owned approximately a one-half stock interest in Mid-Tex; that Mid-Tex purchased gasoline for resale from Bell, a corporation managed by Lubell and

Rothstein, and became indebted to Bell, the gasoline supplier, in a substantial amount. Webb, the original manager of Mid-Tex, absconded and an audit disclosed "a very large shortage" in the company's accounts. Mid-Tex was probably undercapitalized. The original capitalization was $1,000. This was later increased to $5,000. After the departure of Webb, the company if then pressed could not have met all its accounts payable and was probably insolvent. Because of the large indebtedness owed to Bell, that company sent Jenkins to Texas to manage Mid-Tex and paid the greater part of his salary. Prior thereto, Jenkins was an officer of Mid-Tex. Apollo was later organized to take over the assets of Mid-Tex. Allied Chemical was not defrauded by Bell. No credit was advanced by Allied Chemical to either Mid-Tex or Apollo because of any representation, statements or guarantees made by Bell. The separate corporate entity of the three Lubell-Rothstein corporations was maintained. Allied Chemical's losses were due to its extension of credit to Mid-Tex and Apollo. Bell was in no way responsible for Allied Chemical's action in this regard and during the time that Allied Chemical sold petroleum products to Mid-Tex and Apollo, Bell received no payments or credits from Mid-Tex on its indebtedness to Bell.

■ The record before us is unusual in that the judgment on its face recites certain conclusions of both fact and law, and the trial judge filed separate conclusions of fact and law in accordance with Rule 296. These separate conclusions, if considered by themselves, would clearly call for a judgment favorable to Bell. It is not entirely clear whether the conclusion recited in the judgment, and upon which the judgment is based, should technically be considered as one of law or one of fact. The trial court has apparently held that the separately filed findings of fact justify the conclusion that Mid-Tex and Apollo were the agents of Bell and had no corporate identity independent of Bell. We disagree with this conclusion.

The disregarding of the corporate entities of Mid-Tex and Apollo so as to render Bell liable for Mid-Tex' and Apollo's debts cannot be sustained. Judgment is accordingly rendered as heretofore indicated.

HAMILTON, J., not sitting.