Opinion issued February 8, 2007






 











In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00967-CV






FRANK CAPPUCCITTI AND FLOTTEC, INC., Appellants


V.


GULF INDUSTRIAL PRODUCTS, INC., Appellee






On Appeal from the 344th District Court

Chambers County, Texas

Trial Court Cause No. 21812






O P I N I O N

 Appellants, Frank Cappuccitti and Flottec, Inc., file this interlocutory appeal
challenging the trial court's denial of their special appearance motions. Each
appellant contends that the trial court erred in denying its motion because the
evidence is neither legally nor factually sufficient to support the trial court's finding
of specific and general jurisdiction. 

 We affirm the trial court's denial of Cappuccitti's and Flottec's motions for
special appearance.

FACTS

 Appellee Gulf Industrial Products, Inc. ("GIP"), is a Texas corporation with its
primary manufacturing facility located in Baytown, Chambers County, Texas
("Baytown plant"). It was founded by Robert Kerley, its president, in 1994. GIP
manufactures and sells chemicals for use in mining under the tradename "Minerec,"
a well-recognized name in the mining chemicals business.

 In early 2002, appellant Frank Cappuccitti ("Cappuccitti"), a New Jersey
resident, telephoned Kerley at the Baytown plant. He explained that he was the
general manager of the mining chemicals division of Cytec Industries ("Cytec") and
wanted to meet with Kerley. Kerley agreed to a meeting, and Cappuccitti traveled to
Texas and met with Kerley at GIP's Baytown plant. During the meeting, Cappuccitti
explained that he was unhappy with his current job at Cytec because he was not
getting along with the new CEO. Given his experience with Cytec, Cappuccitti told
Kerley that he was thinking about quitting his job at Cytec and forming a new
company and would like GIP to sell product to him. 

 Fearful of potential litigation with Cytec, Kerley originally refused
Cappuccitti's offer, but reconsidered when Cappuccitti proposed forming a
corporation to which GIP could sell its product. A month or two later, Cappuccitti
again telephoned Kerley and told him that he had quit Cytec and wanted "to come out
and talk . . . about buying chemicals from [GIP]." At this meeting, Kerley and
Cappuccitti discussed their potential business relationship. Cappuccitti also showed
Kerley a contract with Cytec that Cappuccitti had signed which disallowed
Cappuccitti from competing with Cytec in the United States. According to
Cappuccitti, this contract left him free to conduct business outside the United States. 
In return for Cappuccitti's promise not to compete with Cytec in the United States,
Cytec had agreed to pay Cappuccitti $200,000 over the next year--money,
Cappuccitti explained, he would contribute to his proposed corporation. As a result
of these meetings, Kerley agreed to use Cappuccitti's proposed corporation as GIP's 
sole distributor outside the United States. No agreement or contract was signed at
this time, however.

 On October 9, 2004, Cappuccitti made another trip to GIP's Baytown plant to
discuss using GIP's trademarked name "Minerec" as the name of his new company. 
Kerley agreed, and Cappuccitti formed Minerec, Inc. ("Minerec"), (1) in the Bahamas
on October 22, 2002. On the same day, Cappuccitti also formed CCC Holdings, Inc.,
Minerec's parent company, in the Bahamas. CCC Holdings, Inc., later changed its
name to Flottec, Inc. ("Flottec"). Flottec owns 90% of Minerec. Cappuccitti is
Flottec's president and sole shareholder and employee. Cappuccitti is also the
president of Minerec and one of only two Minerec employees. The other employee,
Randy Nix, owns the remaining 10% of Minerec. Cappuccitti operates both
corporations from his home in New Jersey. 

 Soon after incorporating Minerec and Flottec, Cappuccitti presented a proposed
set of agreements to GIP. Over the next few months, Cappuccitti and Kerley
negotiated the terms of the agreements between GIP and Minerec. Finally, on
January 2, 2003, Kerley, on behalf of GIP, sent a memorandum to Cappuccitti at
Minerec:

 Frank, I am sending you here four (signed only by me) Agreement
documents for your review, comments, suggestions, etc. and signature
if you feel they are ready to be signed. I signed them to give you
something that might make you feel comfortable as to whether we really
do have a basis for an Agreement on working together. The documents
are, for the most part, taken directly from your latest drafts to me. Any
changes, additions, omissions, etc. are, to a large extent, small, done
with the intent to keep fairness to both parties paramount and workable
for both of us. Please give me your comments and reactions to them,
with special attention to the additions to a couple of sections that I felt
were needed in signed agreements.





 These are the most extensive, lengthy and detailed documents I
have ever signed, without first having them reviewed by an attorney. 
After we have agreed to the DEAL POINTS we should have them
reviewed by DEAL MAKING attorneys.


Attached to the memorandum were (1) a "Sole Distribution Agreement" providing for
Minerec to be the sole distributor of GIP products outside of the United States; (2) a
"Manufacturing Agreement" providing for GIP to be the exclusive manufacturer of
certain products distributed by Minerec; (3) an "Operating Loan Agreement,"
whereby GIP agreed to provide a $450,000 line of credit to Minerec as working
capital; and (4) a general agreement that, among other things, (a) summarized the
distribution, manufacturing, and loan agreements, (b) provided for Minerec and GIP
to make investments in each other's company, (c) granted Flottec the right to
purchase up to 20% of the equity of GIP for a price determined by a formula set out
in the Agreement, (d) offered to both Flottec and Minerec a right of "first refusal to
purchase at the offered price any and all of the assets or equity of GIP offered for sale
to a third party" pursuant to a bona fide sale agreement, and (e) stated the terms by
which the Agreement could be terminated and the effects of a termination without
cause. The attached agreements also provided, among other things, for Minerec to
develop technologies to be manufactured by GIP; GIP to be licensed to use these
technologies; and Minerec to be licensed to use brands and trademarks developed by
GIP.

 According to Cappuccitti, Kerley sent these documents after he had told Kerley
that unless he had a signed contract that made financing available he could not go
forward. After receiving this memorandum and the attached agreements, which had
been signed by Kerley in his capacity as president of GIP, Cappuccitti signed the
agreements (collectively, the "Agreement") in his capacity as president of Minerec. 
According to Cappuccitti, Cappuccitti then called Kerley to let him know that
because he now had "something in writing," he could go forward. Cappuccitti could
not remember whether he specifically told Kerley that he had also signed the
Agreement.

 Once Minerec commenced doing business with GIP, Cappuccitti paid himself 
$10,000 per month as a consultant to Minerec; this continued until November 2003. 
On at least one occasion, Cappuccitti wrote a personal check to pay a Minerec bill. 
The check was drawn on an account Cappuccitti held in his individual capacity and
had opened for the purpose of providing loans to Minerec. When Cytec learned that
Cappuccitti was doing business with GIP, it discontinued its payments to Cappuccitti. 
Cappuccitti did nothing to contest this.

 In April 2004, during the course of a disagreement with Kerley, Cappuccitti
referred to the Agreement between GIP and Minerec. Not knowing to which
agreement Cappuccitti was referring, Kerley told Cappuccitti he did not have a copy
of an agreement. Cappuccitti delivered a signed copy of the Agreement to Kerley.

 The business relationship between GIP and Minerec continued until September
24, 2004, when GIP notified Cappuccitti that it was terminating the Agreement "for
cause, specifically non-performance." Pursuant to the Agreement, following
termination, GIP retained the "Minerec" tradename and Minerec was required to
change its name.

 Following GIP's termination of the Agreement with Minerec, Cappuccitti paid
all of Minerec's obligations, including money Minerec owed to him under a personal
line of credit he had extended to Minerec, except that he did not repay the
$393,342.32 Minerec owed to GIP under GIP's line of credit to Minerec or the
$82,777.31 Minerec owed GIP for product sold by GIP to Minerec. Cappuccitti also
transferred ownership of all of Minerec's assets to Flottec, including all cash
remaining in GIP's accounts, leaving Minerec insolvent. 

TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

 The trial court made the following findings of fact:

 1. The Court finds that Plaintiff Gulf Industrial Products, Inc. ("GIP")
is a Texas Corporation with its principal manufacturing facility located
at . . . Baytown, Texas in Chambers County Texas.

 

 2. The Court finds that Defendants Frank Cappuccitti ("Cappuccitti")
and Flottec, Inc. ("Flottec") did business in Texas. Minerec, Inc.
("Minerec") had contracts and an account with Gulf Industrial Products,
Inc., a Texas Resident, for the manufacturing and delivery of goods in
Texas. The contract was performable in whole or in part in Texas,
Minerec submitted orders, took delivery in Texas of those products that
were manufactured in Texas. Minerec also received loans and lines of
credit from GIP.

 


 3. This Court finds that Flottec and Cappuccitti are alleged to be liable
for the debt of Minerec under doctrines of alter ego, trust fund doctrine
and fraudulent conveyance. Cappuccitti was the President of Minerec. 
Flottec owns 90% of the shares of Minerec. Cappuccitti controlled both
entities. Cappuccitti caused Minerec to sell products received from GIP
while failing to pay GIP. Cappuccitti nevertheless, paid himself. At a
time when Minerec was insolvent, Cappuccitti transferred Minerec's
assets to himself and to Flottec. Cappuccitti and Flottec left Minerec
with no assets and only the debt owed to GIP. By those actions, Flottec
and Cappuccitti are allegedly liable for Minerec's obligations which
occurred in Texas to GIP, a business in Chambers County, Texas.

 

 4. The Court finds that the proposed Agreement, Distribution
Agreement, Manufacturing Agreement and Operating Loan Agreement
(jointly "Agreements") . . . are in dispute. The Court finds that the
disputed Agreements cover assets and stock of GIP located in Chambers
County, Texas.


 5. The Court finds that the proposed Agreements were negotiated in
Texas.


 6. The Court finds that the proposed Agreement provided that Texas law
was to be the governing law.


 7. The Court finds that under the proposed Agreement, CCC Holdings,
n/k/a/ Flottec, Inc. would have the right to purchase stock or assets of
GIP in Chambers County, Texas.


 8. The Court finds that Capuccitti signed documents on behalf of GIP
relating to transactions in Chambers County, Texas.


 9. The Court finds that Cappuccitti attended several executive meetings
of GIP at GIP's offices in Texas . . . . He had access to confidential
management decisions and participated in managing GIP in Chambers
County, Texas.


 10. The Court finds that Cappuccitti used the laboratory facilities of GIP
to conduct metallurgical tests for his separate businesses.

 


 11. The Court finds that Cappuccitti's alleged commission of torts
occurred in Texas. Cappuccitti knowingly entered into an alleged
fiduciary duty or a special relationship with GIP and Cappuccitti's
alleged breaches of those alleged duties to GIP occurred in Texas.


 12. The Court finds that Cappuccitti allegedly misrepresented and
breached the trust placed with him in the negotiation of proposed
Agreements to be held in trust, and executed the documents without
complying with the condition of the trust, that the documents be
reviewed by a lawyer. This breach of trust related to agreements
covering assets and the stock of GIP in Chambers County, Texas.

 

 13. The Court finds that Cappuccitti's alleged acts of common law fraud
occurred in Texas. Cappuccitti made representations in Texas,
communicated with GIP in person and by telephone to GIP's Baytown,
Texas offices. Cappuccitti appeared in Chambers County, Texas in his
individual capacity prior to the formation of Flottec or Minerec, and
made representations to GIP in Chambers County, Texas.

 

 14. The Court finds that Cappuccitti made representations in Texas
which are, in part, the alleged basis of fraud. Cappuccitti failed to
accurately describe the terms of his departure from his previous
employment, failed to truthfully give projections of transactions he
intended to make and intentionally misrepresented his capacities to sell
product overseas and made sales to domestic companies, even though
this was not contemplated by the parties.

 

 15. The Court finds that Flottec and Cappuccitti's alleged trademark
violations and injury to trade name occurred in Texas and against GIP,
a Texas corporation. Cappuccitti used the name "Minerec" after the
right had been terminated. Subsequently, Cappuccitti caused attempts
to log on to the Minerec website to be redirected to Flottec. After
Flottec ceased the redirection of Minerec to Flottec, Flottec's website
had buried meta tags for searches under the name or Minerec. This
infringing activity occurred, in part, in Texas.


 16. The Court also finds that Defendant Flottec posted a website for
marketing in Texas.

 

 

 17. The Court finds that Flottec conducted business with other
businesses in Texas, including, Sasol, Molex, Advanced Aromatics,
Baker Hughes, and Texas Blending. The Court also finds that
Cappuccitti traveled to and conducted business in Texas with those
businesses located in Texas. 


 18. The Court finds that adjudicating the dispute in Texas is not a
burden on Defendants Cappuccitti and Flottec because Minerec is
currently in the lawsuit and Cappuccitti is the President of both.

 

 19. The Court finds that adjudicating the dispute in Texas is not a
burden on Defendants Cappuccitti and Flottec because Flottec does
business with other businesses located in Texas and Cappuccitti
regularly travels to and conducts business in Texas. Minerec has
appeared and answered in this lawsuit and Cappuccitti will be involved
in that case in Texas.


 20. The Court also finds that GIP and Texas have an interest in resolving
the dispute in Texas.


The Court made the following relevant conclusions of law:


 21. Plaintiff GIP pled and proved a prima facie case showing of
jurisdiction. Defendants Flottec and Cappuccitti did not negate all bases
of personal jurisdiction.

 

 22. This court has personal jurisdiction over Defendants Cappuccitti and
Flottec under the Texas long-arm statute and the exercise of jurisdiction
is consistent with federal and state due process standards. Defendants
Cappuccitti and Flottec had minimum contacts with Texas. Cappuccitti
and Flottec purposefully availed themselves of the privilege of
conducting activities within Texas, thus, invoking the benefits and
protections of Texas laws.


 23. In particular, this court has specific jurisdiction over Defendants
because Cappuccitti and Flottec did business, including committing torts
in Texas, and Defendants' alleged liability arises from or is related to
activities conducted within Texas. The activities of Cappuccitti and
Flottec are at least minimal and it was foreseeable that Cappuccitti and
Flottec, or both, might anticipate being haled into court in Texas.


 24. This Court has general jurisdiction over Defendants Cappuccitti and
Flottec because they have a substantial connection with Texas that arises
from this action and that are [sic] directly related to Defendant(s)
activities that were purposefully directed toward Texas, and
Defendant(s) have had continuous or systematic contacts with Texas.


 25. This court's assertion of personal jurisdiction over Cappuccitti and
Flottec will not offend traditional notions of fair play and substantial
justice.


 26. In declaratory actions, the petition must name as parties all persons
or entities that have a claim or interest that would be affected by the
declaration. Flottec and Cappuccitti are proper parties affected by the
declaration, thus the Declaratory Judgment action applies to Cappuccitti
and Flottec.


STANDARD OF REVIEW

 Whether a court has personal jurisdiction over a defendant is a question of law
subject to de novo review. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d
789, 794 (Tex. 2002); Glattly v. CMS Viron Corp., 177 S.W.3d 438, 445 (Tex.
App.--Houston [1st Dist.] 2005, no pet.). The trial court, however, must frequently
resolve questions of fact before deciding the jurisdiction question. BMC Software,
83 S.W.3d at 794. If the trial court enters an order denying a special appearance and
issues findings of fact and conclusions of law, we may review the findings of fact on
legal and factual sufficiency grounds and review the conclusions of law de novo as
a legal question. Silbaugh v. Ramirez, 126 S.W.3d 88, 94 (Tex. App.--Houston [1st
Dist.] 2002, no pet.) (citing BMC Software, 83 S.W.3d at 794). If there is more than
a scintilla of evidence to support a factual finding, the legal sufficiency challenge
fails. Shell Compañia Argentina de Petroleo, S.A. v. Reef Exploration, Inc., 84
S.W.3d 830, 836 (Tex. App.--Houston [1st Dist.] 2002, pet. denied). A ruling will
be reversed for factual insufficiency only if it is so against the great weight and
preponderance of the evidence as to be manifestly erroneous or unjust. Id. 

 While an appellant may not challenge the trial court's conclusions of law for
factual sufficiency, the reviewing court may review the legal conclusions drawn from
the facts to determine their correctness. BMC Software, 83 S.W.3d at 794. If the
reviewing court finds that a conclusion of law is erroneous but that the trial court
rendered the proper judgment, the erroneous conclusion of law does not require
reversal. Id. 

PERSONAL JURISDICTION

 The plaintiff bears the initial burden of pleading sufficient allegations to bring
a nonresident (2) defendant within the provisions of the Texas long-arm statute. (3) Id. at
793. A nonresident defendant challenging the court's exercise of personal
jurisdiction through a special appearance carries the burden of negating all grounds
for personal jurisdiction alleged by the plaintiff. Id.; Glattly, 177 S.W.3d at 446.

 Two requirements must be met before a Texas court can exercise personal
jurisdiction over a nonresident defendant. First, the Texas long-arm statute must
authorize the exercise of jurisdiction, and, second, the exercise of jurisdiction must
be consistent with the guarantees of due process. Tri-State Bldg. Specialties, Inc. v.
NCI Bldg. Sys., L.P., 184 S.W.3d 242, 248 (Tex. App.--Houston [1st Dist.] 2005, no
pet.) (citing BMC Software, 83 S.W.3d at 795).

 The long-arm statute permits Texas courts to exercise personal jurisdiction over
a nonresident defendant that "does business" in Texas. Tex. Civ. Prac. & Rem.
Code Ann. § 17.042 (Vernon 1997); BMC Software, 83 S.W.3d at 795. The statute
lists three activities that constitute "doing business": (1) contracting with a Texas
resident when either party is to perform the contract in whole or in part in Texas;
(2) committing a tort in whole or in part in Texas; and (3) recruiting Texas residents
for employment inside or outside of Texas. Tex. Civ. Prac. & Rem. Code Ann.
§ 17.042. This list, however, is not exclusive, (4) and the statute's "doing business"
requirement is limited only by the requirements of federal due process guarantees. 
Koll Real Estate Group, Inc. v. Purseley, 127 S.W.3d 142, 146 (Tex. App.--Houston
[1st Dist.] 2003, no pet.) (citing Schlobohm v. Schapiro, 784 S.W.2d 355, 356 (Tex.
1990)).

 With respect to personal jurisdiction, federal due process requires two things. 
First, the nonresident defendant must have purposefully established such minimum
contacts with the forum state that the defendant could reasonably anticipate being
sued there. Glattly, 177 S.W.3d at 446 (citing Burger King Corp. v. Rudzewicz, 471
U.S. 462, 475-76, 105 S. Ct. 2174, 2183-84 (1985)). A nonresident establishes
minimum contacts with Texas by purposefully availing itself of the privileges and
benefits inherent in conducting business in the state. Koll, 127 S.W.3d at 146. It is
the quality and nature of the defendant's contacts, rather than their number, that is
important to the minimum-contacts analysis. Trigeant Holdings, Ltd. v. Jones, 183
S.W.3d 717, 725 (Tex. App.--Houston [1st Dist.] 2005, pet. denied). Random,
fortuitous, or attenuated acts, or the unilateral acts of a third party, are not sufficient
to confer personal jurisdiction. Id. Although not determinative, foreseeability is an
important consideration in deciding whether a nonresident defendant has purposefully
established minimum contacts. Glattly, 177 S.W.3d at 446-47.

 The minimum contacts element of due process is further divided into general
and specific personal jurisdiction. Id. at 447. A court may exercise specific
jurisdiction over a nonresident defendant if his alleged liability arises from, or is
related to, an activity conducted within the forum. Id. (citing CSR, Ltd. v. Link, 925
S.W.2d 591, 595 (Tex. 1996)). The contacts must be purposefully directed at the
forum and have a "substantial connection" that results in the alleged injuries. Shell,
84 S.W.3d at 837. We focus our analysis on the relationship among the defendant,
the forum, and the litigation.  Id. A court may exercise general jurisdiction over a
nonresident defendant if the defendant's contacts with the forum state are continuous
and systematic, even if the cause of action did not arise from or relate to the
defendant's contacts with the forum. Glattly, 177 S.W.3d at 447.

 Second, if the nonresident defendant has purposefully established minimum
contacts with the forum, the exercise of personal jurisdiction must also comport with
traditional notions of fair play and substantial justice. Id. (citing Burger King, 471
U.S. at 475-76, 105 S. Ct. at 2183-84). As to fairness, the defendant bears the
burden of presenting a "compelling case" that exercising jurisdiction over him would
not be fair and just. See id. at 450. Only in rare cases, however, will a Texas court's
exercise of personal jurisdiction not comport with fair play and substantial justice
when the nonresident defendant has purposefully established minimum contacts with
the forum state. Guardian Royal Exch. Assurance, Ltd. v. English China Clays,
P.L.C., 815 S.W.2d 223, 231 (Tex. 1991). 

ANALYSIS

 Appellants argue that the evidence was legally and factually insufficient to
support the trial court's findings of general and specific jurisdiction. Appellee
responds that the evidence is sufficient to support both general and specific
jurisdiction over both Cappuccitti and Flottec because (1) Cappuccitti, Minerec, and
Flottec are the alter egos of each other; (2) Cappuccitti, the promoter, owner and
president of Flottec, and Minerec, a subsidiary of Flottec, contracted with a Texas
resident, GIP, in Texas for the purchase of product from GIP and the right to purchase
GIP's assets in Texas, and their Agreement is governed by Texas law; and
(3) Minerec, Cappuccitti, and Flottec committed torts in Texas and directed torts
towards Texas. Appellants respond that Cappuccitti is a nonresident who acted in
Texas only in his capacity as a corporate representative of Minerec and that he is,
therefore, protected from the personal jurisdiction of Texas courts by the fiduciary
shield doctrine and the corporate veil; appellants further argue that Flottec is a
nonresident Bahamian corporation that did not conduct business in Texas.

 Minerec did not contest personal jurisdiction. However, both Flottec and
Cappuccitti made special appearances "to the entire proceeding," rather than asserting
that specific claims were severable and making their special appearances only as to
them. See Tex. R. Civ. P. 120a(1) ("A special appearance may be made as to an
entire proceeding or as to any severable claim involved therein."). Accordingly, if
personal jurisdiction exists over Flottec with respect to any claim alleged by GIP, we
will hold that the trial court properly denied Flottec's special appearance. See Glattly,
177 S.W.3d at 447. Similarly, if personal jurisdiction exists over Cappuccitti with
respect to any claim alleged by GIP, we will hold that the trial court properly denied
Cappuccitti's special appearance. See id.

 As the plaintiff, GIP bore the initial burden of making sufficient allegations to
bring Cappuccitti and Flottec within the personal jurisdiction of the trial court. See
BMC Software, 83 S.W.3d at 793. Once GIP met this burden, Cappuccitti and Flottec
were required to negate all possible grounds for personal jurisdiction. See id.;
Glattly, 177 S.W.3d at 446. 

Minimum Contacts

 Alter Ego

 GIP contends that both Cappuccitti and Flottec are subject to personal
jurisdiction in the Texas state courts because both are alter egos of each other and of
Minerec; therefore, they are not protected from personal jurisdiction by the corporate
veil.

 Minerec does not contest the trial court's exercise of personal jurisdiction. 
Moreover, the contacts herein are sufficient to establish that Minerec entered into a
contract with GIP in Texas under Texas law that was performable in part in Texas and
that Minerec was a party to the allegedly fraudulent transfer of its cash and assets to
Flottec. The contacts are also sufficient to establish that Cappuccitti and Flottec both
interacted with GIP in Texas through Minerec in connection with both the execution
and performance of the Agreement between GIP and Minerec and with the allegedly
fraudulent transfer of GIP's assets out of Texas. Thus, if the actions of Minerec that
occurred in and were directed towards Texas may be imputed to Cappuccitti and
Flottec under the alter ego doctrine, the trial court properly denied the special
appearances.

Corporation and Individual

 In general, a corporation is a separate legal entity that shields its owners and
shareholders from the jurisdiction of a foreign jurisdiction, even if the corporation
itself is within the court's jurisdiction. See J & J Marine, Inc. v. Le, 982 S.W.2d 918,
927 (Tex. App.--Corpus Christi 1998, no pet.). A court may, however, under
appropriate circumstances, pierce the corporate veil and bring shareholders or others
within its jurisdiction as well. BMC Software, 83 S.W.3d at 798. One basis for
piercing the corporate veil is the alter ego doctrine, which applies when there is such
unity between a corporation and an individual that the separateness of the corporation
has ceased and asserting jurisdiction over only the corporation would result in an
injustice. Cf. Howell v. Hilton Hotels Corp., 84 S.W.3d 708, 714 (Tex.
App.--Houston [1st Dist.] 2002, pet. denied) (citing Castleberry v. Branscum, 721
S.W.2d 270, 272 (Tex. 1986)) (applying standard in context of liability). 

 This standard also applies to reverse-piercing cases where asserting jurisdiction
over only the individual would result in injustice. Cf. Bolloré S.A. v. Import
Warehouse, Inc., 448 F.3d 317, 325 (5th Cir. 2006) (citing Zahra Spiritual Trust v.
United States, 910 F.2d 240, 244 (5th Cir. 1990) (recognizing, in context of liability,
that courts can reverse pierce a corporation's veil based on finding of alter ego)). The
end result of both is the same: two separate entities merge into one for jurisdictional
purposes. Cf. Chao v. Occupational Safety and Health Review Comm'n, 401 F.3d
355, 364 (5th Cir. 2005) (stating in context of liability). Thus, to determine whether
an alter ego relationship exists in either situation, courts look to the total dealings of
the corporation and the individual, including the degree to which corporate and
individual property have been kept separately, the amount of financial interest,
ownership, and control the individual maintains over the corporation, and whether the
corporation has been used for personal purposes. Bolloré, 448 F.3d at 325; Howell,
84 S.W.3d at 714. 

 Courts also consider as proof of alter ego the payment of alleged corporate
debts with personal checks or other commingling of funds; representations that the
individual will financially back the corporation; the diversion of company profits to
the individual for personal use; and inadequate capitalization. Carone v. Retamco
Operating, Inc., 138 S.W.3d 1, 13 (Tex. App.--San Antonio 2004, pet. denied). An
individual's standing as an officer, director, or majority shareholder of an entity alone
is not enough to support a finding of alter ego. Id.

Subsidiary Corporation and Parent

 The alter ego doctrine has also been applied in the context of a parent
corporation and its subsidiary. See, e.g., BMC Software, 83 S.W.3d at 799. Texas
courts may exercise personal jurisdiction over a nonresident parent corporation if the
parent's relationship with its subsidiary that does business in Texas is one that would
allow the court to impute the subsidiary's "doing business" to the parent. Cf. BMC
Software, 83 S.W.3d at 798 (stating same principle in converse terms, i.e., imputing
parent's "doing business" to subsidiary). Because Texas law presumes that two
separate corporations are distinct entities (5) and that a corporation is an entity separate
from its officers and owners, (6) the party seeking to ascribe one corporation's actions
to another corporation or individual for jurisdictional purposes by piercing the
corporate veil must prove the alter ego relationship. Id.; Le Meridien Hotels &
Resorts v. LaSalle Hotel Operating P'ship, I, L.P., 141 S.W.3d 870, 881 (Tex.
App.--Dallas 2004, no pet.). 

 To join the parent company and its subsidiary for jurisdictional purposes, the
plaintiff must prove that the parent controls the internal business operations and
affairs of the subsidiary. BMC Software, 83 S.W.3d at 799. The degree of control
exercised by the parent must be greater than that normally associated with common
ownership and directorship. Id. Thus, the plaintiff must present evidence showing
that the two entities are not separate and the corporate veil, therefore, should be
pierced to prevent fraud or injustice. Id. 

Interrelatedness of Cappuccitti, Minerec, and Flottec

 GIP presented sufficient evidence at the special appearance hearing to prove
that a relationship among Cappuccitti, Minerec, and Flottec existed such that piercing
the corporate veil and bringing Cappuccitti and Flottec within the personal
jurisdiction of the trial court is justified. See BMC Software, 83 S.W.3d at 798-99;
Le Meridien Hotels, 141 S.W.3d at 881.

 Cappuccitti incorporated Flottec, the holding company, and Minerec, its
subsidiary, as Bahamian corporations on the same day. He did this in anticipation of
the Agreement with GIP whereby GIP would loan Minerec working capital. 
Although Cappuccitti owned no shares of Minerec directly, he did own 100% of the
shares of Flottec which, in turn, owned 90% of the shares of Minerec. Cappuccitti
also served as the president of Flottec; Flottec had no other employees. Cappuccitti
was also the president of Minerec and one of only two Minerec employees. 
Cappuccitti operated both Minerec and Flottec from his home in New Jersey. 

 Cappuccitti signed the Agreement in his capacity as the president of Minerec.
The Agreement provided, among other things, (1) for GIP to be the exclusive
manufacturer of certain products distributed by Minerec; (2) for Minerec to develop
technologies to be manufactured by GIP; (3) for GIP to be licensed to use these
technologies; (4) for Minerec to be licensed to use brands and trademarks developed
by GIP; (5) for Minerec and GIP to make investments in each other's company; and
(6) for GIP to extend a $450,000 line of credit to Minerec. (7) The Agreement also
granted Flottec the right to purchase up to 20% of the equity of GIP for a price
determined by a formula set out in the Agreement, and it offered to both Flottec and
Minerec a right of "first refusal to purchase at the offered price any and all of the
assets or equity of GIP offered for sale to a third party" pursuant to a bona fide sale
agreement. The Agreement, therefore, was performable in part in Texas by Minerec
in its capacity as a subsidiary of Flottec, and it granted Flottec rights to purchase the
equity and assets of GIP in Texas. See Tex. Civ. Prac. & Rem. Code Ann.
§ 17.042(2).

 From the time Minerec was incorporated and began doing business with GIP
until November 2003, Minerec paid Cappuccitti $10,000 per month as a consultant. 
Moreover, on at least one occasion, Cappuccitti wrote a personal check to pay a bill
of Minerec, rather than Minerec itself paying the bill from a corporate account. The
check was drawn on an account that Cappuccitti held in his individual capacity and
had opened for the purpose of providing loans to Minerec. This checking account
served as one of Minerec's two lines of credit, the other being from GIP. Before the
incorporation of Minerec and Flottec, Cappuccitti explained to Kerley that the
$200,000 that Cytec would pay him over the course of one year was additional money
that would be used to capitalize his contemplated corporation. Cappuccitti failed to
find replacement funding for Minerec, however, when Cytec refused to pay
Cappuccitti. Therefore, Minerec's only sources of funding were Cappuccitti and GIP. 
 When GIP terminated the agreement between itself and Minerec, Cappuccitti
paid all of Minerec's obligations, including money owed to himself pursuant to
Minerec's line of credit with him, except the $393,342.32 due to GIP under its line
of credit to Minerec and the $82,777.31 due to GIP for product it sold to Minerec. 
In his position as president of both Minerec and Flottec, Cappuccitti also transferred
ownership of Minerec's assets to Flottec, including all cash remaining in Minerec's
accounts, leaving Minerec insolvent and unable to pay its debt to GIP. Moreover, the
transfer of Minerec's office equipment from Minerec to Flottec was, in effect, a sale
of assets from which any revenue generated was owed to GIP; Cappuccitti, however,
allegedly transferred the assets from Minerec to Flottec for no value. (8) The record
shows no source of funding for Flottec other than the funds Cappuccitti transferred
from Minerec to Flottec and a $250,000 personal line of credit Cappuccitti secured
in September 2004 and loaned to Flottec for use in the business. (9)

 After considering the evidence, we hold that GIP presented sufficient evidence
that Cappuccitti, Flottec, and Minerec were alter egos of each other such that
exercising personal jurisdiction over Cappuccitti and Flottec is justified in that (1) as
president of both Minerec and Flottec and the sole owner of Flottec, which owned
90% of Minerec, Cappuccitti exercised complete control over the activities of both
Minerec and Flottec; (2) on at least one occasion, Cappuccitti paid a debt of Minerec
with a personal check; (3) Cappuccitti backed Minerec with a personal line of credit
but failed to find replacement funding for Minerec when Cytec refused to pay
Cappuccitti; (4) the Agreement between GIP and Minerec gave Flottec the right to
purchase equity in GIP and gave both Minerec and Flottec a right of first refusal to
purchase GIP's assets in Texas; and (5) Cappuccitti, Minerec, and Flottec allegedly
were used interchangeably to transfer assets from one to the other, (10) which rendered
Minerec insolvent and unable to repay GIP for product GIP sold to Minerec or to
repay GIP for money loaned to Minerec under GIP's line of credit. 

 We conclude, therefore, that GIP met its burden of proving a relationship
among Cappuccitti, Minerec, and Flottec such that piercing the corporate veil and
bringing Cappuccitti and Flottec within the personal jurisdiction of the trial court is
justified. See BMC Software, 83 S.W.3d at 798-99; Le Meridien Hotels, 141 S.W.3d
at 881; see also Bolloré, 448 F.3d at 325; Carone, 138 S.W.3d at 13; Howell, 84
S.W.3d at 714.

 Fiduciary Shield Doctrine

 Appellants contend, however, that acts performed by Cappuccitti and for which
he has been sued are all acts in his corporate capacity for which he is protected
against jurisdiction by the fiduciary shield. We disagree. 

Cappuccitti's Actions After the Incorporation of Minerec and Flottec

 Appellant cites several cases for the proposition that jurisdiction over an
individual may not be predicated on jurisdiction over a corporation unless the
corporation is the alter ego of the individual. See J & J Marine, 982 S.W.2d at 927;
Garner v. Furmanite Australia Pty., Ltd., 966 S.W.2d 798, 803 (Tex. App.--Houston
[1st Dist.] 1998, pet. denied) (citing Stuart v. Spademan, 772 F.2d 1185, 1197 (5th
Cir. 1985)); MacMorran v. Wood, 960 S.W.2d 891, 898 (Tex. App.--El Paso 1997,
pet. denied), overruled on other grounds by Tuscano v. Osterberg, 82 S.W.3d 457
(Tex. App.--El Paso 2002, no pet.); Al-Turki v. Taher, 958 S.W.2d 258, 263 (Tex.
App.--Eastland 1997, pet denied); Vosko v. Chase Manhattan Bank, N.A., 909
S.W.2d 95, 99 (Tex. App.--Houston [14th Dist.] 1995, writ denied); Clark v. Noyes,
871 S.W.2d 508, 518 (Tex. App.--Dallas 1994, no writ) (citing Spademan, 772 F.2d
at 1197). Cappuccitti also cites Siskind v. Villa Foundation for Education, Inc., for
the proposition that a nonresident employee of a foreign corporation cannot be sued
in Texas based on his employer's solicitation of business in Texas because due
process considerations forbid such "bootstrapping" of minimum contacts. 642
S.W.2d 434, 437-38 (Tex. 1982). 

 Because we have already held that Minerec is an alter ego of Cappuccitti, the
corporate form of Minerec does not shield Cappuccitti from suit in Texas in
connection with the activities of Minerec.

Cappuccitti's Actions as Promoter of Minerec

 Nor is Cappuccitti protected by the fiduciary shield with respect to his
activities prior to the incorporation of Minerec. The record shows that Cappuccitti
visited Texas on several occasions before Minerec and Flottec were incorporated on
October 22, 2002, and Cappuccitti admits that he was acting in his capacity "as
promoter of and on behalf of [the] company that became Minerec, Inc." In all of the
cases cited by Cappuccitti, the individual over whom personal jurisdiction was sought
was an officer, employee, or shareholder of an existing corporation. Cappuccitti cites
no authority holding that the fiduciary shield doctrine also applies to a promoter of
a nonexistent corporation. He argues, rather, that because a promoter is generally
viewed as a trustee of his corporation and, therefore, owes a fiduciary duty to the
corporation just as if the principal-agent relationship actually existed, a promoter
should be extended the same protection under the fiduciary shield doctrine as the
corporate officer who also owes a fiduciary duty to the corporation. See 15 Tex. Jur.
3d Corporations § 25 (2004). 

 The fiduciary shield doctrine reflects a judicial interpretation of the phrase
"transacting business." Chase v. Pan-Pacific Broad., Inc., 617 F. Supp. 1414, 1423
(D.D.C. 1985) (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 902 n.2
(2d Cir. 1981) ("The fiduciary shield doctrine is not a constitutional principle, but is
rather a doctrine based on judicial inference as to the intended scope of the longarm
statute.")). In other words, courts applying the doctrine hold that "it is the
corporation--not the individual who acts for the corporation--which is 'transacting
business' under the relevant longarm statute." Chase, 617 F. Supp. at 1423. This
interpretation rests on agency theory: the individual employee or officer who acts for
the corporation is that corporation's agent. See Holloway v. Skinner, 898 S.W.2d
793, 795 (Tex. 1995) ("[T]he actions of a corporate agent on behalf of the corporation
are deemed the corporation's acts."). Thus, a corporate officer's status as an agent
of the corporation for which he acts--not his fiduciary duty to the corporation--is the
basis for application of the fiduciary shield doctrine to him. Appellant's argument,
therefore, that the fiduciary shield doctrine should apply to a promoter based on his
fiduciary duty to the future corporation for which he acts is without merit. A
promoter cannot act as an agent of a corporation that does not yet exist; therefore, the
corporation cannot be transacting business through the promoter, and the fiduciary
shield doctrine cannot apply to him. See Chase, 617 F. Supp. at 1423; see also Fish
v. Tandy Corp., 948 S.W.2d 886, 897 (Tex. App.--Fort Worth 1997, pet. denied) ("A
nonexistent corporation can have no agent."). Accordingly, we hold that the fiduciary
shield doctrine does not protect Cappuccitti with respect to his actions prior to the
incorporation of Minerec.

 We find that Cappuccitti's actions prior to the incorporation of Minerec and
Flottec either occurred in Texas or were purposefully directed at Texas. See Glattly,
177 S.W.3d at 446-47; Shell, 84 S.W.3d at 837. None were random, fortuitous, or
attenuated. See Trigeant, 183 S.W.3d at 725. Thus, Cappuccitti, in his individual
capacity as promoter of Minerec, purposefully availed himself of the privileges and
benefits of conducting business in Texas. See Koll, 127 S.W.3d at 146. Therefore,
Cappuccitti's actions as promoter of Minerec constitute "doing business" in Texas,
and subject him to the specific jurisdiction of the Texas courts in his personal
capacity for all claims and causes of action arising out of or in connection with his
promotion activities. See Tex. Civ. Prac. & Rem. Code Ann. § 17.042; Glattly, 177
S.W.3d at 446-47.

Fair Play and Substantial Justice

 Having found that Cappuccitti and Flottec purposefully established minimum
contacts with Texas, we must consider whether the exercise of personal jurisdiction
over them comports with traditional notions of fair play and substantial justice. See
Glattly, 177 S.W.3d at 447 (citing Burger King, 471 U.S. at 475-76, 105 S. Ct. at
2183-84). In making this inquiry, we consider, when appropriate, (1) the burden on
the defendant; (2) the interests of the forum state in adjudicating the dispute; (3) the
plaintiff's interest in obtaining convenient and effective relief; (4) the interstate
judicial system's interest in obtaining the most efficient resolution of controversies;
and (5) the shared interest of the several states in furthering fundamental, substantive
social policies. Guardian Royal, 815 S.W.2d at 231. 

 First, there is no undue burden on either Cappuccitti or Flottec in defending
this case in Texas. Minerec, Flottec, and Cappuccitti are all alter egos of each other. 
Cappuccitti is president of Minerec, and Minerec did not contest the personal
jurisdiction of the trial court over it. Moreover, Cappuccitti visited Texas on several
occasions to do business in this State in connection with the transactions that are the
subject of this suit. Flottec is the parent of Minerec and a beneficiary of the
Agreement between GIP and Minerec, which gave Flottec the right to purchase equity
in GIP and GIP's assets in Texas. Flottec is also the alleged recipient of Minerec's
tangible assets and funds loaned by GIP to Minerec and allegedly fraudulently
transferred by Cappuccitti from Minerec to Flottec, leaving Minerec insolvent. 
Therefore, transactions involving Cappuccitti and Flottec will necessarily be at issue
in the claims being tried in Texas and will not require great additional burdens to try. 

 Second, Texas has an interest in resolving this dispute because it involves
(a) the solicitation and conduct of business in Texas, including the execution of
agreements performable in part in Texas under Texas law by Cappuccitti in his
personal capacity and as the alter ego of both Minerec and Flottec to the benefit of
all defendants and (b) the alleged fraudulent transfer of the funds of a Texas
corporation out of the country. Texas has a substantial interest in protecting its
citizens both against harm from breach of contract and against harm from the torts
alleged in this litigation. See Silbaugh, 126 S.W.3d at 96 (finding that exercise of
jurisdiction comported with fair play and substantial justice because Texas has an
interest in ensuring that its citizens are protected from breach of contract and tortious
acts committed by nonresidents conducting business in Texas). Third, GIP, as a
Texas corporation with its principal place of business in Texas, can obtain the most
convenient and efficient relief in Texas. Fourth, the efficient resolution of this
controversy is promoted by adjudication in Texas because Minerec has not contested
the trial court's assertion of personal jurisdiction, and, therefore, GIP's suit against
Minerec will go forward in Texas. Trying GIP's suit against Cappuccitti and Flottec,
alter egos of Minerec, in Texas, rather than in New Jersey, will avoid duplication of
efforts and minimize the possibility of inconsistent findings on common issues. See
J.D. Fields & Co., Inc. v. W.H. Streit, Inc., 21 S.W.3d 599, 605 (Tex. App.--Houston
[1st Dist.] 2000, no pet.) (finding the efficient resolution of controversy promoted by
adjudication in Texas because suit against defendant company's surety was still
pending in Texas and reconsolidating the suit against defendants with the suit against
the surety avoided duplication of efforts and minimized the possibility of inconsistent
findings on common issues).

 Lastly, the interests of the two states involved, New Jersey and Texas, are best
served by trying the interrelated claims against all defendants in Texas where the
alleged financial scheme was promoted and partially executed and where the alleged
damages occurred. Accordingly, we hold that the trial court's exercise of jurisdiction
over all defendants does not offend traditional notions of fair play and substantial
justice. See Glattly, 177 S.W.3d at 447 (citing Burger King, 471 U.S. at 475-76, 105
S. Ct. at 2183-84). The trial court's exercise of personal jurisdiction over Cappuccitti
and Flottec is supported by the evidence and is, therefore, proper.

 We overrule Cappuccitti's and Minerec's sole points of error.CONCLUSION

 We affirm the trial court's denial of Cappuccitti's and Flottec's motions for
special appearance.






 Evelyn V. Keyes

 Justice


Panel consists of Justices Taft, Keyes, and Hanks.



 
1. Minerec does not contest the trial court's exercise of personal jurisdiction over it. 
2. A "nonresident" includes "an individual who is not a resident of [Texas]" and "a foreign
corporation, joint-stock company, association, or partnership." Tex. Civ. Prac. & Rem.
Code Ann. § 17.041 (Vernon 1997).
3. The Texas long-arm statute governs Texas courts' exercise of jurisdiction over nonresident
defendants. See id. §§ 17.041-.044 (Vernon 1997), § 17.045 (Vernon Supp. 2006). 
4. BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 795 (Tex. 2002).
5. BMC Software, 83 S.W.3d at 798 (citing Bell Oil & Gas Co. v. Allied Chem. Corp., 431
S.W.2d 336, 339 (Tex. 1968)).
6. Tri-State Bldg. Specialties, Inc. v. NCI Bldg. Sys., L.P., 184 S.W.3d 242, 250 (Tex.
App.--Houston [1st Dist.] 2005, no pet.).
7. Attached to the memorandum as exhibits and incorporated therein were (1) a "Sole
Distribution Agreement" providing for Minerec to be the sole distributor of GIP products
outside of the United States; (2) a "Manufacturing Agreement" providing for GIP to be the
exclusive manufacturer for certain products distributed by Minerec; (3) an "Operating Loan,"
whereby GIP agreed to provide a $450,000 line of credit to Minerec as working capital; and
(4) a general agreement that, among other things, (a) summarized the distribution,
manufacturing, and loan agreements, (b) provided for Minerec and GIP to make investments
in each other's company, (c) granted Flottec the right to purchase up to 20% of the equity of
GIP for a price determined by a formula set out in the Agreement, (d) offered to both Flottec
and Minerec a right of "first refusal to purchase at the offered price any and all of the assets
or equity of GIP offered for sale to a third party" pursuant to a bona fide sale agreement, and
(e) stated the terms by which the Agreement could be terminated and the effects of a
termination without cause.
8. The record contains evidence to support these allegations. Among other things, Cappuccitti
admitted at his deposition that he had transferred "under $10,000 worth of . . . office
equipment" from Minerec to Flottec; at the special appearance, however, he claimed that the
value of the transferred office equipment was about $1,000. Cappuccitti also admitted at his
deposition that he had closed Minerec's bank account and that "there may have been a very
small quantity of money in there . . . transferred over . . . like 2- or $300." Cappuccitti then
retracted this statement, claiming that "the accountants cleaned everything up" and he was
not "sure exactly what they did with . . . dollars that might have been left over." At the
special appearance, however, Cappuccitti denied that any cash had been transferred from
Minerec to Flottec.
9. At deposition, Cappuccitti admitted that, in September 2004, he secured a personal line of
credit from Merrill Lynch for $250,000 secured by his house. He described this as "money
loaned to Flottec" and "used in the business."
10. GIP has alleged fraudulent transfer claims against Flottec and Cappuccitti under the Texas
Uniform Fraudulent Transfers Act (UFTA). See Tex. Bus. & Com. Code Ann.
§§ 24.001-.012 (Vernon 2002), § 24.013 (Vernon Supp. 2006). Under the UFTA, a
fraudulent transfer is one made "with actual intent to hinder, delay, or defraud any creditor
of the debtor." Id. § 24.005(a)(1). The UFTA creates liability not only against "the person
for whose benefit the transfer was made," such as the debtor, but also against "the first
transferee of the asset," or any "subsequent transferee." Id. § 24.009(b); Trigeant, 183
S.W.3d at 726. GIP alleged in its petition that Cappuccitti fraudulently transferred Minerec's
assets to Flottec "with the intent to hinder, delay or defraud [GIP] by placing [Minerec]'s
property beyond GIP's reach." See Tex. Bus. & Com. Code Ann. § 24.005.